ROBERTSON, Justice,
for the Court:
I.
This appeal arises from a successful homicide prosecution and presents important questions concerning admissibility of the victim’s verbal identification of his assailant, made some ten minutes after it happened and some five or six hours before he expired. The trial court admitted the testimony, the hearsay rule notwithstanding. We affirm.
II.
The ease for the prosecution, in sum, is that in December of 1985, Lester Lee Ellis, who had been living in Washington, D.C., came back to Alcorn County, Mississippi, and on December 17, he shot and killed his seventy-six year old great uncle, Alex Edg-erston.
On the morning of December 17, Ellis went to Wal-Mart in Corinth, saying he was going to buy Christmas presents. Instead, Ellis returned with bullets and was seen loading two pistols which he put in a duffel bag. Shortly after noon, Ellis said he was going to Edgerston’s home. A couple of hours later Edgerston had been fatally wounded. Within several minutes thereafter, Ellis returned to the home of Geraldine Walker, his second cousin, with Larry Betts, another cousin, in pursuit asking “What did he kill that old man for,” to which Ellis replied that he “wouldn’t have done it if he hadn’t shot him first.” Ellis tried to give the guns to Walker, but she demanded he leave her house and take the guns with him.
Chief of Police Fred Johnson arrested Ellis behind the Wal-Mart in the Southgate Shopping Center. After having been fully advised of his rights,[1] and having waived same, Ellis told the police that
He had been over to Mr. Edgerston’s house earlier that afternoon and that when he arrived at the residence Mr. Edgerston met him at the door and that he had a gun in his hand. He advised they struggled, there in the door, and during the struggle — and he went so far as to get up and more or less demonstrated to us how the struggle went. He said during the struggle he pulled his own weapon out and indicated to us that Mr. Ellis, the defendant, had his weapon in his right hand and that during the struggle he remembered a gunshot or heard a gunshot. He said following that he left the area and we asked him why didn’t you call for help for your uncle. And he said he did not realize his uncle had been shot at that point. We further asked him why he left and carried his *828 uncle’s gun with him and he told us he was afraid his uncle would shoot him, that is the reason he carried the gun with him. We further asked him about where his weapon was. We had found his uncle’s gun in the duffel bag he was carrying, a .22 caliber revolver, and he told us that he had disposed of the weapon in a garbage can down in the project. We went down to the project and he went with us to show us, and he indicated that it was a metal garbage can. And we went down to the area specified and walked back in behind some apartments there in the project, and he took us right directly to a metal garbage can which was the only one around and almost all of the other ones were plastic, and there was no weapon there in the garbage can. And he suggested at that point that possibly there was some fellows standing around when he went through and deposited it in the garbage can, and maybe one of them had gotten it. We didn’t find the weapon, so we returned to the police station.
Ellis described one of his weapons to the police. He said he couldn’t remember whether it was a .32 caliber or a .25 caliber automatic, but that it was a blue steel gun with a pearl-type handle. The victim’s .22 was found in the blue duffel bag the Defendant had when he was arrested.
On May 8, 1986, the Grand Jury of Al-corn County returned an indictment formally charging Lester Lee Ellis with the murder of Alex Edgerston. Miss.Code Ann. § 97-3-19(1) (Supp.1989). The case was called for trial in Circuit Court on July 29, 1986. The prosecution offered a number of fact witnesses, law enforcement investigators, and the State Medical Examiner who testified to the cause of death. Ellis called no witnesses in his own behalf. In the end, the jury found Ellis guilty of murder and the Circuit Court sentenced him to life imprisonment. Miss.Code Ann. § 97-3-21 (Supp.1989).
Ellis now appeals this conviction and sentence.
III.
Ellis’ sole claim of error on this appeal concerns the admission through Officer Billy Clyde Burns of Edgerston's statement identifying Ellis as his assailant and, perhaps more importantly, explaining that Ellis shot him in the course of an attempted robbery. There can be no doubt that the statement was offered to show the truth of the matter asserted. The defense argues that the statement was hearsay and inadmissible, citing Rules 801 and 802, Miss. R.Ev. Ellis argues further that none of the exceptions to the hearsay rule found in Rules 803 and 804 offer a basis for the Circuit Court’s admissibility ruling.
What happened is this. Some four officers of the Corinth Police Department arrived at the scene of the shooting within little more than ten minutes after it occurred. The last to arrive, Officer Burns, testified that, upon arriving he asked Edg-erston some questions.
A. I asked him who shot him and he said, “my nephew.” I asked him what his name was and he said, “I can’t remember his name. I haven’t seen him in two or three years.” He said, “He’s my niece’s boy.” I asked him where he was at that time and he said that he left. Further questioning, I asked him where did the shooting take place and he said in the kitchen. I asked him why his nephew shot him and he said, “Because I wouldn’t give him any money.” He said that his nephew had come there to use the telephone or something about the telephone and he had pulled the gun and was going to rob him. He further stated that they had a scuffle — I believe the term was a tussle — and to the best of my recollection he made a statement “I put him up a pretty good tussle.” I asked him again why he shot him and he said “I wouldn’t give him my money.” I asked him what kind of gun did he shoot him with and he said that it was an automatic and he thought it was a .32. I asked him for the description of the suspect and he said that he was about 5’ tall and weighed about 150 pounds. He was wearing a blue jacket and that he had left.
*829 This testimony was presented to the jury[2] over timely defense objection.
The Circuit Court held Edgerston’s statement to Burns admissible on dual grounds. Performing its function under Rule 104(a), Miss.R.Ev., the Court held the statement an excited utterance and admissible under Rule 803(2), Miss.R.Ev. In the alternative, the Court held Edgerston’s statement to Burns a dying declaration under Rule 804(b)(2), Miss.R.Ev. We consider the latter point sufficient unto the moment.
Arguably of Shakespearian origin,[3] the dying declaration exception found its traditional justification in the once near universal view that no man would meet his maker with a lie on his lips. See Carver v. United States, 164 U.S. 694, 697-98, 17 S.Ct. 228, 230, 41 L.Ed. 602, 603 (1897); Mattox v. United States, 146 U.S. 140, 152, 13 S.Ct. 50, 54, 36 L.Ed. 917, 921-22 (1892); Hill v. State, 64 Miss. 431, 440, 1 So. 494 (1886). We live in more secular times, still the dying declaration is regarded “a firmly rooted hearsay exception.” [4] Ohio v. Roberts, 448 U.S. 56, 66 n. 8, 100 S.Ct. 2531, 2539 n. 8, 65 L.Ed.2d 597, 608 n. 8 (1980).
Today admissibility of dying declarations is justified on grounds of trustworthiness and necessity, although the latter principle remains the subject of some controversy, for need may hardly justify the use of otherwise unreliable evidence.[5] The trustworthiness ground appears sounder. There remains a broad social consensus that dying declarations are generally reliable. “Since the statement concerns the immediate happening, the danger of fabrication, conscious and unconscious, is lessened.” 4 Weinstein’s Evidence, ¶ 804(b)(2)[01], p. 804-115 (Weinstein and Berger, Ed.1988). Admitting dying declarations fits with the general philosophy of modern rules of evidence that courts should receive the sorts and forms of information reasonably prudent people commonly rely upon in making the important decisions of their lives.
The dying declarations exception to the hearsay rule has recently been codified in this state. Rule 804(b)(2) provides as follows:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(2) Statement Under Belief of Impending Death. In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death imminent, concerning the cause or circumstances of what he believed to be his impending death.
This codification is generally regarded as “less emphatic than in the common law cases” and that, to secure admission into evidence of a dying declaration, “perhaps a *830 lesser showing would suffice” than was required at common law. McCormick on Evidence, 829 (3d ed.1984). In this view we certainly consider that Rule 804(b)(2) carries forward our pre-Rules premise that the declarant’s belief his death was imminent may be shown circumstantially by the apparent fatal quality of his wound, see Watts v. State, 492 So.2d 1281, 1287 (Miss.1986); Rouse v. State, 222 So.2d 145, 148 (Miss.1969); Fulton v. State, 209 Miss. 565, 576-77, 47 So.2d 883, 885-86 (1950); Conway v. State, 177 Miss. 461, 467, 171 So. 16, 17 (1936), for common sense knows what common experience shows: that the dying will often not declare the end they know so imminent and so eminent.
We do not regard it fatal that there is nothing in the record which directly establishes Edgerston’s consciousness of his impending end. On the other hand, the circumstances are overwhelming that Edger-ston should have regarded his wound as mortal. We note particularly Dr. Bennett’s testimony, describing a bullet wound in the right side of the heart
It actually went right into the cavity where the blood flows inside the heart and is called the right ventricle. That is a part of the heart which pumps the blood into our lungs. It passed right into this and exited from this down to the under surface of the sac around the heart, which is the diaphragm. It passed through the diaphragm, went through the liver, through the right kidney and then exited the back.
Dr. Bennett further testified that a normal person shot in the same way would have
collapsed in one minute, thirty seconds or maybe as much as two minutes because the heart would no longer be able to pump blood to keep the brain going. In this case, however, the decedent had a lot of scar tissue around his heart and the effect was to prevent the blood from circling the heart and causing the heart to collapse. In essence, there was no space for the blood to fill up and cause the heart to collapse. He instead bled into his abdominal cavity, and that is why he was able to move around for several minutes.
In fact, Edgerston died some five or six hours after he was shot. Considering his age, the fact he was shot in the heart, we consider unassailable the Circuit Court’s finding that his statements were made “while believing that his death was imminent.”
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.

. See Rule 1.03, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979); Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).

. Officer T. Inman testified after Officer Burns without defense objection and said Edgerston told him essentially the same thing. Inman stated the victim "told me his nephew arrived and asked if he could use the phone to call his mother and said that, when he got off the phone, he advised him that he was going to handcuff him and the deceased told him if he wanted to be handcuffed he’d call the police, and at this time he stated that he tried to rob him and then shot him.” In addition, two other officers had arrived on the scene prior to In-man, and Edgerston gave them the same account.
Ellis’ failure to object that these would be violations of the hearsay rule hardly vitiates the viability vel non of the objection he did make, and no one suggests to the contrary.

. In The Life and Death of King John, the Bard causes the French Lord Melun to utter
Have I not hideous death within my view, Retaining but a quantity of life,
Which bleeds away, even as a form of wax Resolveth from his figure 'gainst the fire?
What in the world should make me now deceive,
Since I must lose the use of all deceit?
Why should I then be false, since it is true
That I must die here and live thence by truth? King John, Act V, Scene IV, lines 22-29.

. For a history of the dying declaration in Mississippi law, see Watts v. State, 492 So.2d 1281, 1287-89 (Miss.1986); Ellis and Williams, Mississippi Evidence 237-38 (2d ed. 1988); McElroy, Mississippi Evidence 213-18 (1955); Goodman, “Hearsay Evidence” in Mississippi Law Institute on Evidence 101-106 (1968).

. See, e.g., Nesson, The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts, 98 Harv.L.Rev. 1357, 1374 (1985).