611 So.2d 924 (1992)
Lincoln BERRY
v.
STATE of Mississippi.
No. 90-KA-118.
Supreme Court of Mississippi.
December 17, 1992.
Derek E. Parker, Yazoo City, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PITTMAN and ROBERTS, JJ.
PITTMAN, Justice, for the Court:
On April 25, 1989, a Yazoo County Grand Jury indicted Lincoln Berry for the March 3, 1989, murder of Kelly Berry. Defense counsel was appointed for Berry. Berry filed a Motion in Limine to exclude any statements made by decedent Kelly Berry prior to his death. The motion was denied. After trial held January 4, 1990, the jury found Berry guilty of murder. Honorable Taylor Sledge sentenced Berry to life imprisonment. Aggrieved by the jury verdict, Berry has filed this timely appeal assigning as error:
I. THE LOWER COURT ERRED BY ADMITTING HEARSAY STATEMENTS ALLEGEDLY MADE BY KELLY BERRY PRIOR TO HIS DEATH.
II. THE LOWER COURT ERRED BY ALLOWING IMPROPER REMARKS TO BE MADE IN CLOSING ARGUMENT BY THE STATE THUS PREJUDICING THE JURY.
III. THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
After considering the above issues, we affirm the judgment below.

*925 I.
Lincoln "Nan" Berry, a resident of Bentonia, Mississippi, was romantically involved with Ruthie Mae Bright at one time, but the relationship ended. On March 3, 1989, Kelly Berry, of no relation to Lincoln Berry, transported Bright, his cousin, to her home, a trailer, in Bentonia after patronizing a "beer joint." About 45 minutes later, while Bright and Kelly Berry were still inside Bright's home, Lincoln Berry arrived at the home "looking for that goddamn Kelly." According to Bright, Lincoln Berry hit her and argued with Kelly Berry, threatening to "get rid" of her and Kelly Berry. Lincoln Berry then left the home. About ten or fifteen minutes later, Lincoln Berry returned to Bright's home. According to Bright, Lincoln Berry "sneaked back up." Bright testified that Lincoln Berry shot Kelly Berry as Kelly Berry was leaving the trailer. Bright stated that Lincoln Berry then "left and run off." Bright's neighbor, Fannie Ingram, testified that Bright smelled of alcohol and appeared intoxicated on the night of the shooting.
Bright's neighbors, Herman and Fannie Ingram, heard disturbances at Bright's home on the night of March 3. Fannie Ingram gave testimony that she saw Lincoln Berry arrive at Bright's trailer and that she heard two men arguing. According to Fannie Ingram, Lincoln Berry told Kelly Berry, "We'll finish this later," as he drove away in his car. Fannie Ingram heard a car arriving in Bright's driveway about ten minutes later. Fannie Ingram recognized the car as the same one that Lincoln Berry had been driving. Fannie Ingram heard a shot and told Herman Ingram, "Herman, I believe Nan done shot Kelly." Fannie Ingram saw Lincoln Berry's car leaving the driveway. When Fannie Ingram went to Bright's trailer to check on the situation, Bright told Fannie Ingram that Lincoln Berry had shot Kelly Berry.
Bright called James Berry, son of Kelly Berry, and the Yazoo County Sheriff's Department around 11:30 p.m. James Berry arrived at Bright's trailer first. James Berry put his father in his car and drove to the University Hospital in Jackson, Mississippi. James Berry testified at trial that his father regained consciousness on the way to the hospital and told James Berry that "Nan" had shot him.
Yazoo County Deputy Sheriff David Smith arrived at Bright's home after James Berry had left with Kelly Berry. Deputy Smith found blood behind the trailer and found shotgun waddings three feet in front of the trailer's front door. Deputy Smith went to Lincoln Berry's home and arrested him for aggravated assault. Deputy Smith searched Lincoln Berry's house and car. No weapon was ever found.
Dr. John Griswold treated Kelly Berry when he first arrived at University Hospital and throughout Kelly Berry's care at the hospital. Dr. Griswold testified that Kelly Berry was intoxicated and unresponsive upon arrival with a blood alcohol level of .30. Kelly Berry's injuries consisted of a severed artery in his right arm, muscle and nerve damage in his right arm, elbow bone damage in his right arm, significant injuries in the abdominal cavity where most of the shotgun pellets had entered involving virtually every organ, and chest injuries involving mostly the skin and ribs. Dr. Griswold stated that more than 20 shotgun pellets had struck Kelly Berry. Kelly Berry remained in shock throughout his hospital stay. Kelly Berry never regained consciousness. He died on March 20, 1989, from the gunshot wounds. Lincoln Berry was charged with murder.
At trial, Lincoln Berry testified on his own behalf. Lincoln Berry claimed that he had gone to Bright's trailer on March 3, 1989, and that Kelly Berry had jumped on him. Lincoln Berry gave testimony that the two men had fought. According to Lincoln Berry, he left Bright's property and never returned. Lincoln Berry denied shooting Kelly Berry.

II.

THE LOWER COURT DID NOT ERR BY ADMITTING STATEMENTS ALLEGEDLY MADE BY KELLY BERRY PRIOR TO HIS DEATH.
Lincoln Berry contends that James Berry's testimony relating a statement allegedly *926 made by Kelly Berry on the way to the hospital incriminating Lincoln Berry was inadmissible as hearsay and such admission constitutes reversible error. The State argues that the testimony was admissible under the present sense impression exception to the hearsay prohibition pursuant to Miss.R.Evid. 803. This Court finds that the testimony was also admissible under Rule 804(b)(2) and that 804(b)(2) is the rule most applicable in the present case.
Rule 803 provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
Further, Miss.R.Evid. 804(b) provides:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) ...
(2) Statement Under Belief of Impending Death. In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.
The State argues that an analysis under Rule 804(b) and whether Kelly Berry believed that his death was forthcoming is not necessary because the statement is admissible under Rule 803. The State relies on Evans v. State, 547 So.2d 38 (Miss. 1989). In Evans, Johnny Lee Evans was convicted of raping a Catholic nun, Sister M. Sister M.'s roommate, Lourdes Esculano, testified on behalf of the State that Sister M. had related to Esculano the incident of the rape by Evans when she returned home. This Court held that Esculano's testimony was admissible as an exception to the hearsay rule under 803(1) and (2) of the Miss.Rules of Evidence. The statement was a present sense impression or an excited utterance because Sister M. complained at the very first opportunity and to the first person she saw after the assault. This Court, citing Harris v. State, 394 So.2d 96, 98 (Ala.Cr.App. 1981), found that the statement qualified as an exception because it was spontaneous.
Kelly Berry's statements qualify as present sense impression or an excited utterance because the statement was made at Kelly Berry's first known opportunity to the first person he saw after the shooting. Kelly Berry made the statement at his first and only known time of consciousness to the first and only person he saw, James Berry. There is nothing in the record to suggest that the statement was not spontaneous.
If the statement made by Kelly Berry to James Berry was not admissible under Rule 803 (which it is) as the State asserts, the testimony is admissible under Rule 804(b)(2). While the testimony can be interpreted as admissible under Rule 803, Rule 803 is not the most accurate avenue for admission of the testimony. Rule 803 is intended for use as tool to admit hearsay statements regardless of whether the declarant is available as a witness. Rule 803(1) and (2) anticipates statements made contemporaneous with the occurrence of an event rendering it unlikely that the declarant made a deliberate or conscious misrepresentation. Rule 803, while applicable when construed by its terms, was not designed for an event exactly like the one at bar. Rule 804(b)(2), on the other hand, anticipates a situation identical to the situation presently at bar and is the better choice for application in this cause. Rule 804(b)(2) allows for the dying words of a decedent victim in a homicide case to be used at trial.
The test for admission under Rule 804(b)(2) is a determination of whether the decedent declarant believed that death was imminent. Ellis v. State, 558 So.2d 826 *927 (Miss. 1990). In Ellis, the victim, before dying, identified his assailant to a police officer. This Court affirmed the admissibility of the police officer's testimony under Rule 804(b)(2). Justice Robertson, for the Court, explained:
Arguably of Shakespearian origin, the dying declaration exception found its traditional justification in the once near universal view that no man would meet his maker with a lie on his lips. We live in more secular times, still the dying declaration is regarded "a firmly rooted hearsay exception."
Today admissibility of dying declarations is justified on grounds of trustworthiness and necessity, although the latter principle remains the subject of some controversy, for need may hardly justify the use of otherwise unreliable evidence. The trustworthiness ground appears sounder. There remains a broad social consensus that dying declarations are generally reliable. "Since the statement concerns the immediate happening, the danger of fabrication, conscious and unconscious, is lessened." 4 Weinstein's Evidence, ¶ 804(b)(2)[01], p. 804-115 (Weinstein and Berger, Ed. 1988). Admitting dying declarations fits with the general philosophy of modern rules of evidence that courts should receive the sorts and forms of information reasonably prudent people commonly rely upon in making the important decisions of their lives.
Id. at 829. (case citations omitted) (footnotes omitted).
Justice Robertson discussed the test of admissibility, a determination of whether the declarant believed that death was imminent. This Court reiterated its previous holding that belief in imminent death may be "shown circumstantially by the apparent fatal quality" of the wound "for common sense knows what common experience shows: that the dying will often not declare the end they know so imminent and so eminent." Id. at 830. It is not regarded by this Court as fatal if there is nothing in the record which directly establishes the victim's consciousness of impending death. Id.
The testimony of James Berry is admissible under Rule 804(b)(2), a rule drafted for circumstances identical to the one currently at bar, and Rule 804 should be applied. Kelly Berry had over 20 shotgun pellets in his body. Every abdominal organ was injured. Additionally, a major artery was severed and his chest was injured. Kelly Berry's consciousness of his own impending death can be reasonably inferred. His statement to his son is admissible as an exception to the hearsay rule. The trial court's ruling was correct, and this assignment of error is without merit.
Likewise, we find that the remaining assignments of error are without merit and choose not to address them.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, McRAE and ROBERTS, concur.
DAN M. LEE, P.J., concurs in result only. BANKS, J., not participating.