728 So.2d 105 (1998)
Jarvis SHELTON a/k/a Jarvis Jay Shelton, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00107 COA.
Court of Appeals of Mississippi.
November 24, 1998.
Rehearing Denied February 9, 1999.
*108 James H. Arnold, Jr., Durant, Attorney for Appellant.
Office of the attorney general by W. Glenn Watts, Attorneys for Appellee.
Before THOMAS, P.J., and KING and SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. Jarvis Shelton was convicted by a Lauderdale County jury of rape, armed robbery, and aggravated assault. Shelton raises thirty-two assignments of error. We affirm on the rape and aggravated assault counts but reverse and render on the armed robbery conviction.

FACTS
¶ 2. We will not name the victim in this case in the interest of her privacy. The evidence that supports the verdict indicates the following. On the night of December 12, 1995, at approximately 8:30 p.m., a woman went to dump her trash at county dumpsters located on Highway 19 North in Lauderdale County. While outside of her vehicle, she was approached by a man holding what appeared to be a three foot long stick. The man demanded her purse. She told him that it was on the seat of her car. Having retrieved the purse, the man then ordered her to remove her clothes. She ignored this command and the order was repeated. She then feigned compliance but as the man approached she attempted to grab the stick. At this point the man struck her in the head, which rendered her unconscious. The assailant then raped her. She regained consciousness during the intercourse but was still disoriented. The assailant left her at the scene. The victim then went to her vehicle and drove to a nearby convenience store where she phoned for help.
*109 ¶ 3. The ensuing investigation led to the arrest of Shelton. The victim identified him. Several witnesses described a vehicle similar to the one that he drove as being at the scene of the crime at the correct time. Two witnesses besides the victim identified Shelton as the man in the truck. Testimony indicated that Shelton, who was then employed with the Doric Vault Company located north of Jackson, had been sent to deliver a burial vault to Meridian on the day of the crime. Blood typing and DNA evidence implicated Shelton.
¶ 4. A jury convicted Shelton on all counts but did not recommend life imprisonment for either of the two charges which could have brought such a penalty. The judge sentenced Shelton to thirty years for the rape count and thirty years for the armed robbery count, to run concurrently with the rape sentence. He was also sentenced to ten years for the aggravated assault count, to run consecutively with the first two counts. Shelton appealed with thirty-two allegations of error.

DISCUSSION
¶ 5. For clarity in analyzing Shelton's multitude of issues, we have grouped those with common factual and legal elements.

Issue I: The Court Erred by Allowing the State to Argue its Case During Voir Dire
¶ 6. Shelton argues that the State improperly and over objection argued much of its case while questioning prospective jurors. A representative example of the comments was the prosecutor's stating that a doctor would testify regarding certain DNA evidence. The supreme court has given broad discretion to trial judges regarding jury voir dire. Even if an orderly development of the case might suggest that the prosecutor should refrain from some of the comments that were made here until his opening statement, the fact that each comment would have been proper at that later time means that no prejudice to the defendant occurred. Corley v. State, 536 So.2d 1314, 1316 (Miss.1988). Any error in denying these defense objections was harmless error.

Issue II: Racially Biased Jury Panel
¶ 7. Shelton claims the jury venire was biased because it did not contain any black males. A defendant does not have a "right to a `petit jury composed in whole or in part of persons of his own race.'" Batson v. Kentucky, 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (quoting Strauder v. West Virginia, 100 U.S. 303, 305, 25 L.Ed. 664 (1879)). The state supreme court has agreed that no requirement exists "that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." Britt v. State, 520 So.2d 1377, 1379 (Miss.1988). The defendant solely relies on the fact that there were no black males on the jury panel as proof of bias. When pressed by the court for a reason to believe the jury selection was flawed, defense counsel responded, "I'm not saying that the selection process was bad. I'm just saying that as a result of whatever the selection process was there is not a fair jury here for this defendant ..." due to the absence of black males on the venire. This is insufficient.

Issue III: The Court Erred by Taking Away Peremptory Challenges
¶ 8. Shelton complains generally that the State excluded black females with its peremptory challenges. No specific juror is mentioned. The State announced six peremptory challenges at one time, and Shelton's counsel stated that he had no objection to them. He has waived any objection regarding those first six challenges but not as to later ones that will subsequently be discussed.
¶ 9. Shelton also asserts that some of his own peremptory challenges were denied, and the trial court improperly failed "to permit the Appellant to have other jurors on the panel to select from rather than requiring the Appellant to keep the specific juror who had previously been challenged peremptorily by him...." After the State's first peremptory challenges, Shelton exercised eight of his own. The State objected and argued that Shelton was racially motivated in striking only white jurors. Accepting that this constituted a prima facie case of discrimination, the court required race neutral reasons to be stated.
*110 ¶ 10. The first difficulty is that Shelton makes a blanket complaint about not being allowed his strikes, but discusses no specific juror or error. We accept that this is a charge that all the strikes should have been allowed, but it makes the appellate task more difficult.
¶ 11. We will discuss each challenge that was disallowed. All eight were against white jurors. The first challenged juror was a white, 41-year-old woman. Shelton argued that sex and age was the reason for the strike. The court correctly pointed out that a juror's sex is not a proper basis for striking. J.E.B. v. Alabama, 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Age is not yet a constitutionally prohibited category, but the court pointed out that Shelton had accepted a 49-year-old and a 44-year-old juror. The court found that the reasons stated were pretextual.
¶ 12. The second challenge was accepted. That juror was a 59-year-old white woman whose age was the alleged basis. The third, which was disallowed, was to a white male aviation mechanic whose occupation was the concern. The judge found that the asserted basis was a pretext for a racial challenge. The fourth juror was a white female bookkeeper who had previously been on a criminal case jury that reached a guilty verdict. She also was struck because her occupation involved careful detail work which might increase her importance in a case in which scientific evidence was critical. The court noted that two black jurors who had previously served on juries that had reached guilty verdicts were accepted by the defense. Even so, the court said he would give Shelton "the benefit of the doubt" and allowed the challenge.
¶ 13. The fifth challenged juror, sex unstated, was a state employee who might be more likely to convict. The court accepted the challenge. The sixth challenge was to a white woman whom the defense wished removed because her husband was an engineer. The court found no possible legitimate concern arising from the husband's job and determined that the challenge was improperly motivated by race. The next challenge was to a white juror who had previously been on a jury that reached a guilty verdict, and the challenge was permitted.
¶ 14. The final challenge in the initial set was to a male who was a community college baseball coach who might tend to be a leader on the jury. That also was permitted.
¶ 15. After the trial court's review of these challenges, Shelton's counsel attempted to make a Batson complaint about the State's earlier challenges. The judge refused, accurately stating that he had asked counsel if there were any objections and none were voiced. "I purposefully [] try to bring some order to this jury selection process," he said and would not start over. We find no error in that.
¶ 16. The State next challenged two jurors, and Shelton complained of one. This also was a black juror, and the court found that a prima facie case of racial discrimination existed based on all of the first six challenges being to black jurors. The stated reason was that the woman had previously served on a jury that had acquitted in a rape case. Shelton's counsel was asked if he re-called whether the State had accepted any white jurors with the same acquittal background, and none were named. The challenge was accepted.
¶ 17. Shelton again exercised challenges with the next group of jurors tendered to him. The first was to a 66-year old white woman, who was allegedly too old. The court pointed out that a 74-year-old black woman had been accepted and thus denied the challenge as racially motivated. A 24-year-old white woman was struck as being too close to the age of the victim, but the court stated that Shelton had accepted a 23-year-old black woman. This challenge also was disallowed. The next two challenges were accepted as both being jurors who had reached guilty verdicts in other trials.
¶ 18. The final disallowed challenge was to a white male accountant who would be too "detail oriented" with the scientific evidence. The trial judge found that to be a pretext and referred to other occupations such as bank teller which he thought required *111 equally meticulous individuals and were not the basis of challenges.
¶ 19. The trial court's determination that a challenge is for a racial reason is a question of fact for the trial judge and will not be disturbed on appeal unless clearly erroneous. Lester v. State, 692 So.2d 755, 794-95 (Miss.1997). The record amply demonstrates a judge fully familiar with his duties under Batson and diligent in their performance. The record supports the judge's decisions.
Issue IV: The Verdict Is Against The Overwhelming Weight of The Evidence is Contrary to Law, or Alternatively, The Verdict Is a Direct Result of The Cumulative Errors Committed by The Trial Court And Another Jury Should Be Permitted to Hear This Cause
Issue XI: The Court Erred by Allowing The Victim to Identify The Appellant When She Previously Testified That She Could Not Positively Identify Him And After Being Shown Composites Prior to Photographs
Issue XX: The Court Erred by Overruling the Appellant's Motion for a Directed Verdict
Issue XXXI: The Court Erred by Overruling Appellant's Motion for a New Trial or in the Alternative for a Judgement Notwithstanding the Verdict of the Jury
¶ 20. Three offenses are the subject of this appeal: rape, aggravated assault, and robbery. The weight and sufficiency of evidence as to each count must be separately considered. Issues of disputed fact are jury questions. Reversal is not permitted absent evidence that a reasonable juror simply could not have found guilt. Lee v. State, 469 So.2d 1225, 1229-1230 (Miss.1985).
¶ 21. Shelton argues that the testimony of Michael Fields, Clayton Rutledge, Rhonda Holloway, and Officer Knight all support the defendant's claim of where he was during the commission of the crimes which occurred around 8:30 p.m., December 12, 1995. Michael Fields, president of the Doric Vault Company, testified he went by the plant around 10:30 to 10:45 p.m. He observed that the burial vault that Shelton was to deliver the following day had already been loaded. This indicated Shelton was back at the plant by 10:30 p.m. Fields further testified it took about fifteen to twenty minutes to load a vault.
¶ 22. Officer Knight testified it took two hours and eight minutes (at approximately sixty mile-per-hour) to drive along the most direct route between Barham funeral home, the location from which the defendant claimed to have left, and the Doric Vault Company. He also testified that the scene of the crime was closer to Doric Vault, by several miles, than to Barham Funeral home. This testimony at most indicates that Shelton may have had to be speeding between Meridian and Jackson to get back to the plant and load the vault by 10:30. That possibility does not strain credulity.
¶ 23. The prior inconsistent statement of Clayton Rutledge is addressed in a later issue. As for his being led by the prosecution, Rutledge was on cross examination and leading questions are permissible. M.R.E. 611(c).
¶ 24. Rhonda Holloway testified that she saw only the side of the man who was in the truck. Nevertheless, she was able to pick him out of the photographic line-up. Her testimony is ambiguous on how good a view she actually got of the man in the truck, but this goes to her credibility. The jury was aware of these facts. When testimony is impeached it is a matter for the jury to consider and the result "will not be set aside where there is substantial and believable evidence supporting the verdict." Billiot v. State, 454 So.2d 445, 463 (Miss.1984).
¶ 25. The victim identified Shelton even though she had earlier testified she could not positively identify the man who had attacked her. She then identified Shelton as the person whose photographs she had picked out as looking like her attacker. The jury was made aware that the victim picked out the defendant's picture from two photographic line-ups after having been shown a composite picture. Viewing the photographs after having viewed the composite was not unduly suggestive but rather goes to the weight and credibility of the victim's identification *112 of the defendant. In order for an identification to be impermissible it is not enough that a lineup be suggestive but rather it must "under the totality of the circumstances... g[i]ve rise to `a very substantial likelihood of irreparable misidentification.'" Foster v. State, 493 So.2d 1304, 1306 (Miss. 1986) (quoting York v. State, 413 So.2d 1372, 1383 (Miss.1982)). We cannot say the victim's identification meets this standard.
¶ 26. We find no error much less cumulative error in regards to the rape and aggravated assault counts. Motions for a new trial or a judgment notwithstanding the verdict on those charges were properly denied.
¶ 27. The armed robbery conviction, however, is a different matter. Shelton asserts that the prosecution failed to show the use of force and thus did not prove robbery. The difficulty is that the indictment is more narrowly written than is the relevant statute. Under the indictment, the State had to prove that Shelton took the victim's purse "against her will by violence to her person by the use of a deadly weapon, a long blunt stick, putting [the victim] in fear of immediate injury...." Because of this language, the State had to show that violence was a factor in the robbery. The robbery statute, on the other hand, requires that property be taken against the victim's will "by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon...." Miss.Code Ann. § 97-3-79 (Rev.1994). Thus the statute permits conviction if violence is shown or if a person is put in fear by the display of a deadly weapon.
¶ 28. The victim's own testimony indicates that no force or violence was used during the robbery, only the threat of violence. Brandishing the stick, Shelton ordered her to give him her purse. The victim was then standing outside her car and, without any physical force applied to her, told Shelton that the purse was inside the car. He then went to the car and took it. We find that "violence" requires some use of force, no matter how slight, and that none was used here. We must therefore reverse and render on the armed robbery conviction. The defect is not that the evidence failed to prove robbery as defined by the statute, but that it failed to prove it as limited by the indictment.
Issue V: The Court Erred in Overruling Appellant's Motion to Sequester the Jury
Issue XVI: The Court Erred by Not Declaring a Mistrial When a Request Was Made to Sequester the Jury at a Time When Broad Press Coverage Was Apparent and the Court Was Made Aware of Broad TV Coverage
¶ 29. Under Rule 10.02 of the Uniform Rules of Circuit and County Court Practice, a party may request sequestration "at least 48 hours in advance of the trial." URCCC 10.02. Granting the request is a discretionary matter with trial court, in nondeath penalty cases, but "[i]n the absence of a request, the court may, on its own initiative, sequester a jury at any stage of a trial." Id. Shelton made no request that the jury be sequestered until well into the trial. This decision was a matter of discretion resting with the trial court and will not be reversed absent a showing of abuse of that discretion.
¶ 30. There is no evidence to conclude the jury was influenced by any outside sources. The judge admonished the jurors not to watch television or review any news information about the trial. He questioned the jurors about whether or not they had viewed such material and none indicated they had seen any such information. The defense's assertion that questioning the jury was ineffective because a juror would not admit viewing such information disparages the jury process itself. "[T]he jury is presumed to follow its instructions.... The jury is presumed to have followed the instruction given by the trial judge and there is no reversible error." Harmon v. State, 453 So.2d 710, 712 (Miss.1984). Absent evidence to the contrary, an appellate court presumes jurors act properly. Although Shelton claims that reporters attempted to interview the defendant, defendant's counsel, and the prosecutor, there is no claim that attempts were made to interview any jurors.
Issue VI: The Court Erred in Allowing Testimony Regarding a Tainted And Suggestive Lineup When Appellant Was Present For a Physical Lineup

*113 Issue XIX: The Court Erred by Overruling Appellant's Objection to Unduly Suggestive Photos Used in Lieu of an Actual Physical Lineup at a Time When the Appellant Was in Custody

¶ 31. Shelton argues that an accused is entitled to a physical lineup rather than a photographic line up if it is possible to conduct a physical lineup. The cited authority does not support this proposition. We find none ourselves nor do we find the point to be persuasive as a matter of logic or good sense.
¶ 32. Clayton Rutledge and Rhonda Holloway had been at the dump site the evening of the offense. Rutledge had gone up to Shelton's truck and talked with him, apparently shortly before the offenses occurred, while Holloway returned to the couple's vehicle from the dumpsters and saw the side of Shelton's face when she looked back to see with whom Rutledge was speaking. Rutledge testified without objection that he worked with an investigator to prepare a composite picture. Another day he returned to the police station and upon being shown five photographs, immediately identified Shelton. Similarly, Holloway testified that she had separately identified Shelton in a photographic lineup. Significantly, no objection to her testimony was made.
¶ 33. The identification by these two witnesses was unequivocal. Both testified that they quickly chose Shelton's picture when the lineup occurred. We will not further address the identification questions as the absence of an objection at trial waives the issue.

Issue VII: The Court Erred by Improperly Allowing Rape Kit Evidence
¶ 34. The defense questions the integrity of the chain of custody of the victim and suspect rape kits. While the emergency room physician took the evidence for the victim's rape kit, he did not actually transfer the kit to any law enforcement officer. Instead he instructed a nurse, Carolyn Johnson, who sealed the kit in the doctor's presence, to transfer the kit. Nurse Johnson did not testify. Officer Hobson did and stated that he received the sealed kit from nurse Johnson. Hobson then stored the rape kit in a refrigerator at the sheriff's department. "Should a chain of custody objection arise, the trial court should inquire whether there is any indication or reasonable inference of probable tampering with or substitution of the evidence." Wilson v. State, 574 So.2d 1324, 1335 (Miss.1990). The defense presents no evidence of tampering or substitution. This Court finds no such evidence, and therefore no chain of custody defect exists.
¶ 35. The defense further complains that the rape kit examination of Shelton was dated incorrectly. Officer Nester was cross-examined about this and testified it was simple human error. He dated the suspect's rape kit evidence as having been collected on the 18th rather than the 19th of December 1995. This was a question of credibility for the jury and not a matter of error for appeal.

Issue VIII: The Court Erred by Allowing Evidence of Rape When the Victim Denied Knowledge of Penetration
¶ 36. Although the victim testified that the blow to her head caused her to be unconscious when the rape began, she became conscious before her attacker finished his sexual act. There is no shortcoming in the proof regarding penetration.
Issue IX: Photographic Evidence Was Not Disclosed in Discovery
Issue XV: The Court Erred by Refusing to Declare a Mistrial When the Prosecutor Had Photographs in His Hand in Sight of the Jury at a Time When the Photographs Had Been Specifically Excluded from Evidence
¶ 37. Contrary to Shelton's assertion here, the trial court did not overrule but rather sustained the defendant's objection to admission of photographs of the victim's injuries into evidence. The court gave the prosecution an option of having the photographs marked for identification only but they were not admitted into evidence until the sentencing phase.
¶ 38. The defense makes reference to Rule 4.06 of the Uniform Criminal Rules of Circuit Practice, now codified as Rule 9.04 of the Uniform Rules of Circuit and County Court Practice. The rule addresses proper *114 procedure to be followed when a party attempts to introduce evidence in violation of discovery. The trial judge followed the rule and decided to refuse admission of the photographs into evidence but not to grant a mistrial. This is in complete accord with the rule. URCCC 9.04(I)(2).
¶ 39. The judge noted, "The jury has not seen any of these photographs. The record will speak for itself. There were some basic questions about the photographs, preliminary questions and the witness was in the process of identifying one of the photographs when the jury was excused. I see no error or harm. The jury has no information and has not viewed the photographs." Moreover, the trial judge prohibited the prosecution from making any further references to the pictures during the remainder of the trial, though the pictures were later admitted during the sentencing phase.
¶ 40. The day after the dispute regarding the photographs, Shelton argued that his family sitting in the audience had seen the photographs while the prosecutor held them in his hands. As a result the jury must have seen them as well. The court found as a matter of fact that the jury could not have seen the photographs with any meaningful clarity while the prosecutor held them in his hands. The court questioned the jurors upon their return to the courtroom regarding whether they had seen the pictures. No juror stated that the pictures had been viewable. The court made an admirable record for this Court's review, enabling us to find that no error based on this argument was required.
Issue X: The Court Erred by Allowing Testimony Regarding Steel Rebars When the Victim Repeatedly Testified She Was Hit with a Stick
Issue XVIII: The Court Erred by Overruling the Appellant's Objections to the Admission of Two Steel Rebars When the Victim Testified That She Was Struck with a Stick
¶ 41. The defendant asserted in his discussion of issue IV that there was 1) no physical evidence found on the rebar, and 2) the victim testified she had grabbed the item and it felt like a "stick." No stick was ever introduced, though it may be hard to imagine a wooden stick sufficiently hard to render the victim unconscious with one blow. There was testimony that steel "rebars," being extremely hard metal rods about three feet in length, were found in Shelton's truck. There was no error in allowing testimony of the metal rods even though the victim stated she thought she had been attacked with a stick. She also testified that the rebar exhibited to her at trial was "about the right size and shape...." She had thought that the stick had etchings on it or might have had duct tape wrapped around it to give it a rough texture. Such a description was for the jury to weigh regarding its consistency with the rough, almost etched surface of a rebar rod.
¶ 42. When asked if the rebar was inconsistent with what she had seen, the victim responded, "No." This testimony establishes the relevancy of the rebar evidence. The prejudice arising from the fact that an absolutely positive identification was not made does not substantially outweigh the probative value of the testimony. Foster v. State, 508 So.2d 1111, 1117 (Miss.1987). The rebar fit the general description of the instrument used in the assault. It thus showed that the defendant had access to an instrument very similar to the type involved. Id. at 1118. Thus neither the testimony about the rebar nor the two pieces of rebar introduced into evidence were improper.

Issue XI
¶ 43. This issue was addressed in issue IV.

Issue XII: The Court Erred by Allowing Testimony of Seminal Fluid Stains
¶ 44. The court did not overrule but rather sustained the defendant's objection to testimony about whether seminal fluid had been found on the victim's pants. The objection was sustained on the grounds of improper re-direct examination. Shelton also alleges that the court should have granted a mistrial at this point. The decision that "an error is incurable, resulting in a mistrial, rests within the sound discretion of the trial court." Snelson v. State, 704 So.2d 452, 456 (Miss.1997). We find no abuse of discretion in this trial court's refusal to grant a mistrial as this event hardly constitutes "substantial *115 and irreparable prejudice to the movant's case." URCCC 3.12.

Issue XIII: The Court Erred by Allowing Testimony of DNA Testing of Anal Swabs
¶ 45. Testimony was introduced over Shelton's objection that anal swabs were performed and tested. There was no evidence of anal penetration, but there was evidence that the perpetrator of this rape had rendered his victim unconscious for most of the time of the intercourse. A doctor testifying to what he found in a logical process of examining the victim is fully justified.
Issue XIV: The Court Erred by Excluding The Written Statement of Clayton Rutledge
Issue XXI: The Court Erred by Allowing the Witness, Clayton Rutledge, to Make an Unsolicited Self-Serving Narrative Statement Directed by the Prosecution Not in Response to Any Question over a Defense Objection
Issue XXII: The Court Erred by Overruling Appellant's Objection and Motion for a Mistrial When the Lower Court Excluded the Written and a Signed Statement Obtained by an Investigative Officer
¶ 46. Witness Rutledge gave a statement to police a few days after the crime. It was typed by an investigator, then read and signed by Rutledge. In that statement Rutledge described leaving the dump site and passing a car that he testified must have been the victim's vehicle as she was arriving before the attack. Rutledge's girlfriend, Rhonda Holloway, testified that they went to Wal-Mart before heading home, but Rutledge was not questioned about that. He stated that they drove approximately three miles towards their home, then turned around and went back to a grocery that was within view of the dump site. Police cars had arrived by that time as a result of the victim's report of the crime. Rutledge and Holloway decided due to the police activity not to go into the store. Rutledge then in his written statement said, "As we were leaving the store lot, he was leaving the dumpster." Who was the "he" who was leaving the dumpster became an issue. Rutledge denied that it was Shelton. At trial Rutledge stated that he could not reconstruct what he may have meant by that phrase. He thought that the phrases may have gotten written down somewhat out of sequence, and he had not seen anyone leave the dump site after the time that he saw the police. Rutledge testified that he did not see Shelton again after Rutledge first left the dumpsters to go home. Thus Rutledge admitted the prior statement and explained it.
¶ 47. The trial court refused to introduce the prior statement into evidence. "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same...." M.R.E. 613(b). This suggests that if an explanation is first permitted, the statement may then be introduced. That is not how the supreme court has interpreted the rule, however: "under Rule 613, once a witness `explains' a prior inconsistent statement by admitting it, the statement cannot be admitted into evidence." Conner v. State, 632 So.2d 1239, 1260 (Miss. 1993). Rutledge admitted making the prior inconsistent statement. He did not deny it nor claim not to remember it. Rutledge frankly stated he was at a loss to explain why he had made this part of the statement to the police. Rutledge was extensively examined as to the inconsistencies and was cooperative. This is not the situation of a witness claiming he does not remember making a statement. Bush v. State, 667 So.2d 26, 28 (Miss.1996).
¶ 48. The trial court committed no error by refusing to admit Rutledge's statement into evidence. We also reject Shelton's argument that the written statement was admissible as a hearsay exception under 803(8)(C), since it was not a "factual finding[]" by an investigative officer but merely the statement of Rutledge himself. M.R.E. 803(8)(C).
¶ 49. Shelton also complains that the prosecutor improperly cross-examined Rutledge, led the witness regarding his statement, and permitted speculation as to its meaning. "The manner of trial decorum, use of leading questions, etc. are matters largely left to the discretion of the trial judge, as he is present, has the opportunity, as well as the *116 duty, to see that the course of the trial is conducted in conformity with traditional notions of fairness and impartiality to the litigants." New Orleans & Northeastern R.R. v. Weary, 217 So.2d 274, 279 (Miss.1968). Rutledge was on cross-examination and leading questions are permissible. M.R.E. 611(c).
¶ 50. Finally, the statement was not an exception under Rule 803(8)(A) because it was not a statement by a public agency nor was it "setting forth (A) the activities of the office or agency...." M.R.E. 803(8), (8)(A). It was authored by Rutledge and was simply the statement of a witness. Given these conclusions, we likewise hold the defendant's motion for mistrial was properly refused.

Issue XV
¶ 51. This issue was addressed with issue IX.

Issue XVI
¶ 52. This issue was addressed with issue V.

Issue XVII: The Court Erred by Overruling Repeated Objections to Repetitious and Cumulative Testimony
¶ 53. The prosecution put on several witnesses who testified to seeing a vehicle, resembling that driven by the defendant, at the scene of the crime near the time of the crime. Even if this court were to agree this testimony was repetitious and cumulative, it would be harmless error as repetitive relevant testimony does not constitute reversible error. Beckwith v. State, 707 So.2d 547, 576 (Miss.1997). Declining to grant a mistrial was not an abuse of the trial court's discretion.

Issue XVIII
¶ 54. This issue was addressed with issue X.

Issue XIX
¶ 55. This issue was addressed with issue VI.

Issue XXI
¶ 56. This issue was addressed with issue XIV.

Issue XXII
¶ 57. This issue was addressed with issue XIV.

Issue XXIII: The Court Erred by Overruling the Defendant's Objection to Instruction S-3
¶ 58. This issue concerns the principal instruction on armed robbery. Since we have already reversed the robbery conviction, we need not consider this issue.

Issue XXIV: The Court Erred by Overruling Appellant's Objection to Instruction S-4
¶ 59. Although the victim stated that she thought she had been attacked with a stick, she also testified that the steel rebar exhibit was "about the right size and shape" and when asked if the rebar was inconsistent with what she had seen, the victim responded, "No." Moreover she described seeing "something that looked like maybe etchings on it" which is consistent with steel rebar. The level of damage to the victim further makes it unlikely she was hit with a "stick" as that term is commonly understood. We find no error in the courts usage in the instruction of the terms "blunt club or stick."

Issues XXV & XXVI: The Court Erred by Refusing Instructions D-1 & D-3
¶ 60. A trial judge is not "required to grant cumulative or repetitious instructions." Irving v. State, 441 So.2d 846, 850 (Miss. 1983). Specifically, both D-1 and C-8 address the credibility of witnesses. Instruction D-3 was cumulative with S-2A on the elements of rape.

Issue XXVII & XXIX: The Court Erred by Refusing Instruction D-4 & D-6
¶ 61. These instructions concern the robbery count and are moot since we are reversing that conviction.

Issue XXVIII: The Court Erred by Overruling Instruction D-5
¶ 62. Defense instruction D-5 was cumulative of S-4 on the elements of aggravated assault and did not track the statute. D-5 required the jury to find Shelton "was not acting in self-defense...." Self-defense was not raised as an issue, and thus no evidence would support such an instruction nor is the phrase part of the definition of the *117 crime that would require it to be in the instruction.

Issue XXX: The Court Erred in Allowing Testimony of Alleged Facts and Unindicted Crimes During the Sentencing Phase of the Trial
¶ 63. A presentence report was received by the trial court. Reference to other crimes appeared in the report. Such information is a proper consideration at sentencing. Jackson v. State, 551 So.2d 132, 148-149 (Miss.1989). The case law that Shelton cites merely discusses the admissibility of certain kinds of evidence at the guilt stage of the trial. E.g., Amacker v. State, 676 So.2d 909, 912 (Miss.1996).

Issue XXXI
¶ 64. This issue was addressed in issue IV.

Issue XXXII: The Court Erred by Sentencing the Appellant to a Term in Excess of His Life Expectancy
¶ 65. The supreme court has held that where a jury cannot agree to set a sentence at life imprisonment and where the "crimes grew out of a series of violent acts by one individual toward another individual in an unbroken chain of events ..." the sentences imposed may in the aggregate exceed the defendant's "actuarial life expectancy.... [E]ach sentence is to be imposed without respect to the other." Erwin v. State, 557 So.2d 799, 803 (Miss.1990). To do otherwise may well create a situation "where it [would] be impossible for the State to impose any meaningful sentence where more than one crime was committed." Id. We note that the jury in this case found that the sentence should not be life imprisonment on the rape and robbery counts. This was not an instance as in Erwin, where the jury could not reach a decision on sentencing to life or not. However, for purposes of this issue, we find this to be a distinction without a difference.
¶ 66. There was no error in the sentence imposed on the defendant for rape and aggravated assault.
¶ 67. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION ON COUNT I OF RAPE AND SENTENCE OF THIRTY (30) YEARS; AND CONVICTION ON COUNT III OF AGGRAVATED ASSAULT AND SENTENCE OF TEN (10) YEARS, WITH SENTENCES TO RUN CONSECUTIVELY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND PAYMENT OF A $10,000 FINE, IS AFFIRMED. THE CONVICTION ON COUNT II OF ARMED ROBBERY IS REVERSED AND RENDERED. COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HERRING, HINKEBEIN, KING and PAYNE, JJ., concur.