# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01854-COA

ANTHONY W. CARTER A/K/A ANTHONY CARTER A/K/A ANTHONY WARREN CARTER

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT: 12/12/2019
TRIAL JUDGE: HON. DAL WILLIAMSON
COURT FROM WHICH APPEALED: JONES COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY: ANTHONY J. BUCKLEY
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 10/26/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1. Anthony Carter[1] was arrested on April 7, 2016, and charged with possession of a weapon by a felon. After a jury trial on December 11, 2019, Carter was convicted and sentenced to seven years in the custody of the Mississippi Department of Corrections, with five years to serve and two years of post-release supervision. He appealed, raising three issues: (1) the trial court erred in allowing the State to use his mother's prior unsworn

---

[1] For the remainder of the opinion, we will refer to the defendant as "Carter." His relatives listed in the opinion who share his last name will be referred to by their first names.

statements as substantive evidence; (2) there was insufficient evidence to support his conviction; and (3) his counsel was ineffective. Finding no error, we affirm Carter's conviction and sentence.

**FACTS**

¶2. On April 7, 2016, the Ellisville Police Department received a 911 call reporting gunshots. A dispatcher told Officer Mike Williams that the 911 caller was the mother of the suspect who was firing the weapon. The dispatcher identified the mother as Shana Carter. Officer Williams responded and went to Shana's home.

¶3. Upon arrival, Shana explained to Officer Williams "[t]hat her son had shot at her other son." She further explained that her son Carter was the one shooting and "was located at the house across the street." She said that "he was in there and has numerous weapons in there." Officer Williams testified that Shana was "very upset." The house Shana was referring to was owned by "Mr. Henry,"[2] who was out of town at the time of this incident. Carter was "watching" Mr. Henry's home while he was away.

¶4. Officer Williams approached the front of the house in an effort to make contact with Carter. At trial, he testified that "[Carter] would not respond." Officer Williams set up a secure perimeter around the house and radioed for help from "Jones County Sheriff's Department, because we only had two active police officers at the time for Ellisville." During the time a Jones County sheriff's officer was responding, Officer Williams noticed "[a] side window where someone was looking out." After approximately "an hour" standoff,

---

[2] Mr. Henry's first name is not in the record.

Chief Bruce Russell of the Ellisville Police Department arrived, and Carter "[c]ame out of the house" and was arrested without further incident.

¶5. After arresting Carter, Officer Williams and other officers "cleared the house for safety" and found no one else in the home. Officer Williams located a "long gun, a rifle hidden in an attic fan," and Investigator Scott Wuertz "took control of it."

¶6. Officer Williams also testified that after Carter was arrested, he spoke to Shana again, and she provided a handwritten statement, which she dated and signed. After being asked by the State to do so and without objection from defense counsel, Officer Williams read the statement to the jury. The handwritten statement was then introduced as State's Exhibit 1, again without objection. In summary, the statement essentially recounted how Carter got into an argument with his ex-girlfriend, and "[his brother] Justin [Powell] pulled him out of her truck. He started cussing and threatening and went over to Mr. Henry's house and Justin was trying to talk to him and calm him down and he got a gun and fired numerous shots." The statement then reads that "Justin left," he went back to Shana's home, and she then "called 911." At the time the handwritten statement was introduced and read as an exhibit at trial, Shana had not yet testified. Officer Williams was the first and only witness at that time.

¶7. The State's next witness at trial was Shana. She testified that she lives close to Mr. Henry's house, where Carter was arrested. She explained that Carter was "watching" the house while Mr. Henry was out of town. Apparently, at the time of the incident, Carter and his wife were separated, but she came by Shana's house to drop off their child. Shana testified Carter and his wife "argued a lot," and she told her to leave before Carter came back

3

home. Shana explained that "[s]he just was lingering around, she got a new truck and I guess kind of being arrogant and wanting to show it off." As soon as Carter arrived, Carter and his wife began to argue. Then Carter got in the truck, and Justin "kind of pulled him out of the truck." She added, "[Carter] stormed off across the street and I guess they went back to Mr. Henry's house." Shana then heard Carter and Justin arguing and said she "called the police because he had locked himself up in Mr. Henry's house." She denied hearing gunshots because two weeks after the incident "[her] son" told her "he didn't have a gun."[3]

¶8.     On direct examination, Shana was shown the handwritten statement, and she admitted that she wrote it and that the entire statement was consistent with her courtroom testimony except the part about a gun. Further, on direct examination she was asked whether she said Carter had a gun in a news interview she gave to a local TV station on the night of the incident.[4] She responded, "If that's what the video said. I don't remember everything?" The video of Shana talking to the news media was then played for the jury, but only the part of her talking and not the reporter's entire comments. Shana insisted she "didn't see" Carter "with a gun." She added, "I mean at the time it was obvious that I thought he had a gun, but then later I found out that he did not have a gun." On cross-examination by Carter's attorney, Shana indicated she was on social security disability for "mental retardation," and she was

---

[3] Shana explained that Carter "didn't talk to me for two weeks" after the incident.

[4] Carter's attorney filed a pretrial motion to exclude the introduction of the televised interview, claiming Shana's video statement was inadmissible hearsay. At the hearing, the trial judge stated Shana's statement in the video could be used for impeachment purposes if she testified inconsistently at trial. Following the hearing, the trial court issued a written ruling stating the video was hearsay but admissible as an exception under Mississippi Rules of Evidence 803(1) and 803(24).

on a lot of "narcotics" and "not in my right mind."

¶9. The State's next witness was Chief Russell of Ellisville Police Department. Chief Russell had convinced Carter to come out of the house. He arrested Carter and had to deal with the media. Finally, Chief Russell testified that before trial, Justin came by and told him "[T]hat is my brother, I don't remember nothing."

¶10. The State's last witness was Scott Wuertz, an investigator with the Ellisville Police Department. Investigator Wuertz testified that he responded to the scene and after Carter's arrest he went into the house and found the gun in the ceiling in the "attic fan." Investigator Wuertz testified at trial that the gun was .22-caliber long rifle. He further testified that he collected live ammunition from the gun as well. Investigator Wuertz stated that he located two spent shell casings outside "on the concrete." The rifle was introduced as Exhibit 7. Investigator Wuertz also testified as to several pictures of the gun, which were introduced, and the shell casings he collected outside. He testified the gun was "clean" despite there being a lot of dust and dirt in the area in the attic where the gun was found. Investigator Wuertz explained to the jury that he left the scene that night as it became dark but returned the next day when the sun rose. At that time, he found four more shell casings. Finally Investigator Wuertz testified that Carter's brother Justin never presented himself to the police for an interview, nor did any other family member of Carter.

¶11. The defense called Justin, who denied a gun was involved and claimed he told police that night there was no gun involved. Further, Carter's other brother, Zera Carter, was called by the defense. Zera confirmed the fight but indicated he left when the police arrived

5

because he was completing drug court.

¶12. Carter was the defense's final witness. He admitted to the alleged altercations with his wife and brother but denied having a gun that day. Carter claimed he had never seen the .22-caliber rifle, which had been placed into evidence. Carter also claimed his "mom had called the police for several crazy things." Carter finished by saying, "I did not have a gun, did not fire a weapon. There was no DNA . . . no fingerprints. . . . I did not possess any type of weapon."

¶13. The jury ultimately found Carter guilty of possession of a weapon by a felon. Carter's post-trial motions were denied, and he appealed.

## ANALYSIS

### 1. Shana's Written Statement and Televised Video Statement

¶14. Carter first argues that the trial court erred in allowing Shana's prior written statement and television interview to be presented to the jury. The standard of review for admission of evidence is abuse of discretion. *Smith v. State*, 986 So. 2d 290, 295 (¶12) (Miss. 2008) (citing *Jones v. State*, 962 So. 2d 1263, 1268 (¶21) (Miss. 2007)).

#### A. Written Statement

¶15. Carter claims that Shana's unsworn statement given to law enforcement on the day of the incident was improperly introduced as substantive evidence during Officer Williams' testimony and Shana's testimony. Carter failed to object at the trial level, which constitutes a waiver of the issue on appeal. *Giles v. State*, 282 So. 3d 519, 525 (¶14) (Miss. Ct. App. 2019). Carter acknowledges that he did not object to the introduction of the written

6

statement at trial, but he argues its introduction was "plain error." "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." *Galloway v. State*, 122 So. 3d 614, 630 (¶18) (Miss. 2013). Further, the Mississippi Supreme Court has stated that "[a] review under the plain error doctrine is necessary when a party's fundamental rights are affected, and the error results in a manifest miscarriage of justice." *Johnson v. State*, 235 So. 3d 1404, 1414 (¶31) (Miss. 2017) (citing *McGee v. State*, 953 So. 2d 211, 215 (¶8) (Miss. 2007)).

¶16.    Officer Williams read Shana's written statement to the jury during his direct examination and before Shana testified:

> Alana brought [Aniya] to my house. I told her with plenty of time to spare that [Carter] was up the road so she could drive off.  She just sat there and waited for him to walk to her truck. He tried to get in, but the door was locked.  He grabbed on the side of her truck and she gassed the truck, I'm assuming with him hanging on the side and went up the road.  Got to the stop sign and then apparently opened the door.  So he got in the truck.  She backed back down here and Justin pulled him out of her truck and she drove off.  **[Carter] started cursing and threatening and went over to Mr. Henry['s] house. And Justin was trying to talk to him and calm him down.  And [Carter] got a gun and fired numerous shots.  Justin left and come back over here, and I called 911.**

(Emphasis added).

¶17.    At first glance, the unsworn statement appears to be hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *White v. State*, 48 So. 3d 454, 457 (¶12) (Miss. 2010); *accord* MRE 801(c).  The prohibition of hearsay statements applies to written

7

as well as verbal statements. *Shelton v. State*, 728 So. 2d 105, 115 (¶48) (Miss. Ct. App. 1998). However, a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving the person." MRE 801(d)(1)(C); *see, e.g.*, *Smith v. State*, 25 So. 3d 264, 272-73 (¶¶24-25) (Miss. 2009).

¶18.     In *Smith*, 25 So. 3d at 271-72 (¶22), the Mississippi Supreme Court addressed whether the victim's prior unsworn statements could be introduced as substantive evidence to prove the defendant's guilt. At trial, the victim stated he did not see the shooter. *Id*. at 271-72 (¶22). That testimony contradicted his prior statement given to law enforcement, in which he had named the defendant as the shooter. *Id*. at (¶21). After the victim denied knowing the shooter, the State showed the victim his written statement to refresh his memory. *Id*. at (¶20). The victim confirmed the statement was his but claimed the statement was "false." *Id*. at 268, 271 (¶¶6, 20). The defendant was found guilty. *Id*. at 268 (¶8). On appeal to the supreme court, the defendant challenged the admission of the victim's prior unsworn statement. *See id*. at (¶9). The supreme court held that the statement was admissible under Mississippi Rule of Evidence 801(d)(1)(C) because (1) the victim testified at trial and was subject to cross-examination, and (2) identified the defendant as the shooter based on his perception. As a result, the court held that the statement could be admitted as substantive evidence of the defendant's guilt. *Id*. Further, the court noted that "regardless of whether the witness has been impeached, the Mississippi Rules of Evidence, adopted in 1986, 'provide that such identification evidence is not hearsay and is admissible as substantive

material.'" *Id*. at 272 (¶24) (quoting *Livingston v. State*, 519 So. 2d 1218, 1221 (Miss. 1988)).

¶19. Similar to the victim in *Smith*, Shana testified at trial and was subject to cross-examination. Additionally, Shana's statement identified Carter as the shooter based on her perception. Specifically, she stated that "[Carter] started cursing and threatening and went over to Mr. Henry['s] house. And Justin was trying to talk to him and calm him down. And [Carter] got a gun and fired numerous shots. Justin left and come back over here, and I called 911." Consistent with the supreme court's holding in *Smith*, we find Shana's statement was admissible under Mississippi Rule of Evidence 801(d)(1)(C). Therefore, the statement was admissible as substantive evidence of Carter's guilt.

¶20. The State also used Shana's written statement to impeach her during her testimony. The State asked Shana if she heard gunshots the day of the incident. She responded, "I thought at time that's what I heard but my son two weeks . . . told me he didn't have a gun, he was slamming that big metal door in his face and they were fussing and cussing at each other." The State asked Shana if she had provided a written statement to the police department on the night of the incident. Shana responded, "I don't remember [writing a statement]." At that point, the State handed Shana a copy of State's Exhibit 1—her written statement. The State asked her again if she remembered giving the statement. Shana said, "I mean, I wrote it." As previously stated, the written statement was properly admitted into evidence during Officer Williams' testimony in accordance with Mississippi Rule of Evidence 801(d)(1)(C). Accordingly, we find this issue to be without merit.

9

### B.     Televised Video Statement

¶21.    Carter next argues that the court erred in allowing Shana's televised video statement to be played for the jury.  Carter's attorney filed a motion in limine to exclude the video, and the court denied his motion.  Although Carter's attorney did not object to the video statement at trial, the Mississippi Supreme Court has held "that a defendant's motion in limine regarding the introduction of evidence properly preserved the issue for appeal, and an objection was not necessary."  *Goff v. State*, 14 So. 3d 625, 640 (¶46) (Miss. 2009) (citing *Kettle v. State*, 641 So. 2d 746, 748 (Miss. 1994)); *see also Grindle v. State*, 134 So. 3d 330, 340 (¶39) (Miss. Ct. App. 2013).  Thus, we find Carter properly preserved this issue for appeal.

¶22.    During direct examination, the State asked Shana if she gave a television interview.  Shana testified that she could not remember what day the interview was taken but that she "heard it the other day."  The State then asked if she remembered telling the reporter that Carter had come "to the door with a gun and fired off several shots."  Shana responded that she did not remember saying that, but she "heard the video the other day."  She further claimed that the statement was "inaccurate."  At that point, the State played Shana's portion of the television interview for the jury.  In the beginning of the video, Shana stated that "[Carter] came to the door with a gun and fired off several shots."  The video interview was never officially admitted into evidence, although it was certainly played for the jury.[5]

---

[5] The exact purpose of the video interview is unclear, as it was never marked as an exhibit or moved to be admitted into evidence.  Further, the trial court never issued a limiting instruction to the jury on how the evidence was to be considered—impeachment versus substantive.  Because we find the statement admissible under 801(d)(1)(C), the

10

¶23. In accordance with *Smith*, the televised video statement was admissible as substantive evidence under Mississippi Rule of Evidence 801(d)(1)(C). As stated above, Shana testified at trial, was subject to cross-examination, and identified Carter as the shooter based on her perception. *See* MRE 801(d)(1)(C); *see, e.g.*, *Smith*, 25 So. 3d at 272-73 (¶¶24-25). Further, once Shana claimed the statements on the video interview were "inaccurate," and because the prior statement was inconsistent with the trial testimony, the State was allowed to utilize the video interview for impeachment purposes as well. Therefore, we find this issue to be without merit.

## 2. Sufficiency of the Evidence

¶24. Carter next contends that the evidence at trial was insufficient to support his conviction of being a felon in possession of a firearm. Sufficiency of the evidence claims are reviewed de novo. *Sanford v State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal quotation marks omitted) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). The evidence is viewed in a light most favorable to the State, which means the State is given all favorable inferences that can be reasonably drawn from the evidence presented at trial. *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014). If the court finds that a reasonable trier of fact could find the essential elements to be proven beyond a reasonable doubt, this Court will uphold the jury's verdict. *Ronk v. State*, 172 So.

question surrounding its introduction becomes academic and does not alter the outcome of this opinion.

3d 1112, 1129 (¶3) (Miss. 2015).

¶25.    Mississippi Code Annotated section 97-37-5(1) (Rev. 2014) provides that "[i]t shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm . . . ." "To prove possession of a firearm by a . . . felon, the State must prove two things: (1) the person was in possession of a firearm, and (2) the person had been convicted of a felony crime." *Henderson v. State*, 117 So. 3d 636, 638 (¶7) (Miss. Ct. App. 2013) (quoting *Young v. State*, 95 So. 3d 685, 688 (¶10) (Miss. Ct. App. 2011)). At trial, both parties stipulated Carter had been convicted and sentenced for a felony prior to April 7, 2016. Thus, our analysis focuses on whether there was sufficient evidence presented to show Carter was in possession of a firearm.

¶26.    Officer Williams testified he was dispatched to Shana's home after she called 911 and the suspect was "firing the weapon." Upon arrival, Shana told him that Carter was inside Mr. Henry's house and that Carter had tried to shoot her other son. Relying upon that information, Officer Williams went to the house and knocked on the front door, but no one answered. He observed a person looking out of one of the house's windows. Officer Williams testified he was one of only two Ellisville police officers on duty, so he contacted the Jones County Sheriff's Office, as well as the Ellisville police chief and an investigator. After Carter's arrest, the house was searched, and Carter had been the only person seen in the home since the police arrived.

¶27.    Investigator Wuertz testified that Mr. Henry's home was already surrounded by deputies and police officers when he arrived at the scene. He used a loudspeaker to order

anyone in the house to come out and surrender, but no one did so. Chief Russell similarly testified that when he arrived at the scene, Mr. Henry's house was surrounded. Chief Russell had known Carter since Carter was a child, and he succeeded in convincing Carter to come out of the house and surrender. At that time, Carter had been in the house and surrounded by law enforcement personnel for approximately one hour.

¶28. Investigator Wuertz also testified that after Carter was arrested, law enforcement personnel entered the house. He and Officer Williams both saw a rifle stock abutting from a ceiling fan. The rifle had been placed in the attic through the fan. On further examination, it was found to be a partially loaded .22-caliber rifle. In addition, eleven spent bullet casings were recovered inside and outside of the house. The rifle itself was clean and did not show any dust, despite having been in a dusty attic area in a fan.

¶29. No one entered the home during the standoff, and no one was in the home when it was searched after Carter surrendered. Carter had access to anywhere in the home for approximately one hour. The rifle's magazine was partially empty, and shell casings were found in and around the home. Finally, Shana's written statement and video statement identified Carter as the shooter.

¶30. There was no physical evidence presented that Carter physically possessed the firearm. However, constructive possession of a firearm can be established by showing that the firearm was under the dominion and control of the defendant. *Roney v. State*, 294 So. 3d 1268, 1272 (¶14) (Miss. Ct. App. 2020) (citing *Williams v. State*, 971 So. 2d 581, 587 (¶16) (Miss. 2007). Further, constructive possession may be proved by circumstantial evidence.

13

*Bates v. State*, 952 So. 2d 320, 325 (¶21) (Miss. Ct. App. 2007) (citing *Martin v. State*, 413 So. 2d 730, 732 (Miss. 1982)). The Mississippi Supreme Court recently held that circumstantial evidence may carry the same weight as direct evidence. *See Nevels v. State*, No. 2020-KA-00335-SCT, 2021 WL 3672784, at **2-3 (¶¶12-14) (Miss. Aug. 19, 2021). Here, the jury was given a constructive-possession instruction. In viewing evidence in a light most favorable to the State, this Court finds that there was sufficient evidence that would lead a reasonable trier of fact to conclude beyond a reasonable doubt that Carter was guilty of possession of a weapon by a felon.

### 3. Ineffective Assistance of Counsel

¶31. Finally, Carter claims his trial counsel was ineffective for (1) failing to object to the "repeated instances" of the admission of "incompetent evidence"; and (2) failing to request a cautionary limited instruction. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)). Such claims will be addressed on direct appeal when "[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*. Additionally, such claims may be resolved "on direct appeal when the record affirmatively shows those claims are without merit." *Id*. Here, both parties stipulate that the record is adequate to consider Carter's claim for ineffective assistance of counsel on direct appeal. After review, we find the record before

us is sufficient to decide Carter's claim because the record affirmatively shows Carter's claim is without merit.

¶32. To prove his counsel's assistance was ineffective, Carter must show (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. A strong but rebuttable presumption exists that counsel's performance was effective. *Gilley v. State*, 748 So. 2d 123, 129 (¶20) (Miss. 1999). First, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Quinn v. State*, 191 So. 3d 1227, 1234 (¶27) (Miss. 2016) (quoting *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)). Second, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gilley*, 748 So. 2d at 129 (¶20) (quoting *Strickland*, 466 U.S. at 694). If the defendant cannot satisfy both *Strickland* prongs, his claim fails. *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶33. As for the first prong, the question is whether Carter's counsel was deficient for failing to object to the admission of "incompetent evidence" and failing to request a cautionary liming instruction. As part of his argument, Carter claims that "the [jurors were] actively encouraged to decide among themselves which was true, the unsworn out-of-court statements or the sworn testimony at trial."

¶34. There is a presumption that decisions made by defense counsel are strategic, and this

Court "will not second-guess counsel's decisions that fairly may be characterized as strategic." *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015). This Court has held that "[c]ounsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003) (citing *Scott v. State*, 742 So. 2d 1190, 1196 (¶14) (Miss. Ct. App. 1999)). Furthermore, "[h]aving a trial strategy negates an ineffective assistance of counsel claim, regardless of counsel's insufficiencies." *Hall v. State*, 735 So. 2d 1124, 1127 (¶10) (Miss. Ct. App. 1999).

¶35. After reviewing the record, we cannot say that Carter's attorney was deficient. As previously discussed, Shana's prior unsworn statements were property admitted under Rule 801(d)(1)(C). Additionally, Carter's attorney filed a pretrial motion to suppress the video statement, and the court denied the motion. Further, it is obvious from reading the entire transcript of the trial that Carter's counsel's strategy was to try and convince the jury that Shana was mistaken in her statements, not that she did not make those statements. In other words, Shana and Carter admitted she made the now-complained-of statements but that she was mistaken when she made them. Carter's attorney offered another plausible explanation for the sound: a door slamming instead of gunshots. Carter's attorney offered explanations for that mistake: (1) she was disabled due to mental retardation, and (2) she took medications that made her mind unclear. It was never denied that Shana made those statements. Again, the attorney's trial strategy was that Shana was simply mistaken. "[N]either [the Supreme Court] nor the Court of Appeals sits as [a] thirteenth juror. We do not make independent

16

resolutions of conflicting evidence. Nor do we reweigh the evidence or make witness-credibility determinations." *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017) (internal quotation marks and citation omitted). Those responsibilities rest with the jury. Here, the jury heard the evidence presented by the State and the defense, weighed the witnesses' credibility, and was properly instructed by the court. Apparently, the jury did not believe the defense's theory of the case. A trial strategy, once tried and rejected by a jury, is not a sufficient basis to reverse a conviction on an ineffective- assistance-of-counsel claim. *See Hall*, 735 So. 2d at 1127 (¶10). For these reasons, Carter fails to satisfy the first *Strickland* prong.

¶36. Although we do not need to go further, the second prong requires us to determine whether there is a reasonable probability that the outcome at trial would have been different had Carter's attorney objected to the introduction to either of the statements at trial or requested a cautionary limiting instruction. *See Gilley*, 748 So. 2d at 129 (¶20). Given the fact that both of Shana's statements were properly admitted and that there was sufficient evidence to support Carter's conviction, we find there is no reasonable probability that the outcome of his trial would have been different. Accordingly, we find Carter's claim for ineffective assistance of counsel is without merit.

**CONCLUSION**

¶37. In summary, we find that Shana's written statement and video statement were properly admitted pursuant to Rule 801(d)(1)(C). We also find sufficient evidence exists to support Carter's conviction. Finally, we find that Carter did not receive ineffective assistance of

17

counsel.  Accordingly, we affirm Carter's conviction and sentence.

¶38.    **AFFIRMED.**

      **CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  BARNES, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**