MAXWELL, J.,
for the Court:
¶ 1. The hearsay exception for dying declarations is so firmly rooted in our common law that it was incorporated as a historical exception to the Sixth Amendment right to confront one’s accuser. This long-recognized evidentiary exception’s interplay with the Confrontation Clause is front and center in Brandon Grindle’s appeal of his deliberate-design murder conviction. On appeal, Grindle challenges the trial judge’s decision that the shooting victim’s nonverbal responses to a police officer’s questions about who shot him, made immediately before his death, were admissible as dying declarations. He also claims the admission of these statements violated his Sixth Amendment confrontation right.
¶2. We disagree with Grindle’s insistence that the officer’s testimony describing the victim’s deathbed identification— initially given at a pretrial hearing and later admitted at trial — became retroactively inadmissible because a nurse later testified the victim may have lost consciousness during the officer’s interview. We instead find any conflicts raised by the subsequent testimony merely challenged the officer’s credibility and reliability, creating an issue for jury resolution. And the nurse’s later-given testimony neither altered the fact.that the dying declaration, which met all requirements of Mississippi Rule of Evidence 804(b)(2), had already been properly admitted, nor required the judge to sua sponte strike the officer’s testimony and give a curative instruction. Thus, we find the trial judge did not abuse his discretion in admitting the victim’s dying declaration. And since dying declarations have been accepted under common-law tradition since well before the founding and ratification of America’s Constitution, we find applying this exception does not offend Grindle’s Sixth Amendment confrontation rights.
¶ 8. As to Grindle’s other claimed errors, none of which were preserved at trial, we find no plain error. We also decline to consider whether Grindle’s trial attorney, who does not represent Grindle on appeal, was constitutionally ineffective. We find this issue more appropriate for post-conviction-relief proceedings, where, if Grindle chooses to pursue this avenue, a record on trial counsel’s performance can be developed.
¶ 4. For these reasons and those discussed below, we affirm Grindle’s conviction for deliberate-design murder and his life sentence.
Facts and Procedural History

I. Fatal Shooting

¶ 5. Charles Brown was walking down the street in front of his house when he was shot twice by the driver of a green Ford sport utility vehicle. When officers arrived, Brown was still conscious but bleeding heavily. Paramedics transported *335 him to the hospital while officers remained at the scene to interview witnesses.
¶ 6. After interviewing several witnesses, officers determined there had been bad blood between Brown and Grindle. Brown’s girlfriend, with whom he had a child, was also the mother of Grindle’s daughter. And Grindle believed Brown was mistreating his young daughter. A month earlier, the two fathers had gotten into an argument during which Brown had purportedly pulled a gun on Grindle. But on the day of the shooting, it was Grindle who had a gun.
¶7. Although the actual pistol used to kill Brown was never recovered, two different witnesses testified that on the day of the shooting they saw Grindle riding around in a Ford SUV with a pistol. One of these witnesses, Michael Smith, Grin-dle’s daughter’s uncle, was flagged down by Grindle. The two got into a fight about Brown. Smith testified that Grindle reached behind his seat, grabbed a gun, and put it in his lap. Another witness, Terrell Cruz, claimed to have been riding around with Grindle in the SUV earlier that day. He also testified that Grindle had a pistol in the SUV, which he described as a .45 caliber — the same caliber pistol used to shoot Brown.
¶ 8. Two other witnesses who were in the vicinity of the shooting testified at trial. Oscar Walker saw Grindle drive by in a green Ford Expedition fifteen minutes before the shooting. Walker described hearing gunshots, then seeing the same Ford vehicle drive away. Rashad Newton was also near Brown when he was shot. Newton testified that he saw Grindle’s vehicle pull up to Brown and saw Brown start backing away. Shots were then fired from Grindle’s vehicle, hitting and ultimately killing Brown.
¶ 9. While a variety of witnesses implicated Grindle as the killer, Grindle primarily focuses his appeal on Officer Richard Browning, the responding officer who interviewed Brown in the emergency room. The victim, Brown, was intubated at this point and could not speak. But Officer Browning, who was familiar with Brown and Grindle from their prior run-in, testified that he was able to ask Brown a series of questions to which Brown responded by nodding his head affirmatively. The questions were aimed at identifying the shooter. According to Officer Browning, when he asked Brown if Grindle was the person who shot him, Brown emphatically nodded “yes.” Shortly after this exchange, Brown died from his wounds.
¶ 10. After a day of being sought by the police, Grindle turned himself in. He was charged with killing Brown by deliberate design without authority of law — i.e., “first-degree murder.” Miss.Code Ann. § 97-3-19(l)(a)(Rev.2006).

II. Motion in Limine

¶ 11. Before trial, Grindle filed a motion in limine to exclude Officer Browning’s testimony about the emergency-room exchange with Brown. The State conceded Brown’s affirmative responses were hearsay, but argued they were admissible as statements under belief of impending death — commonly referred to as “dying declarations.” M.R.E. 804(b)(2). Grin-dle’s counsel disagreed and argued Brown’s alleged nodding did not meet the criteria of a dying declaration.
¶ 12. At the motion hearing, Officer Browning testified about his interaction with Brown in the emergency room. While doctors were trying to save Brown’s life, Officer Browning asked Brown if he could hear him. When Brown nodded “yes,” Officer Browning further inquired if Brown knew who shot him. Brown gave another affirmative nod. Officer Browning *336 followed up by asking if it was the same person Brown had trouble with earlier — a reference to the altercation with Grindle a month earlier. Again, Brown nodded “yes.” Officer Browning then asked if that person was “Grindle,” to which Brown gave a final nod. At some point after this exchange, Brown began to decline rapidly and, within minutes, died.
¶ 13. Grindle’s attorney cross-examined Officer Browning, honing in on Brown’s condition at the time the interview. Counsel asked Officer Browning about Brown’s “Glasgow score”[1] and his responsiveness level. Throughout questioning, Officer Browning remained consistent that he believed Brown could understand him and was responding to his questions. Grindle rested without calling any witnesses or offering any evidence to contradict Officer Browning’s testimony.
¶ 14. The trial judge held that Brown’s nodding, while nonverbal, met the criteria of a “dying declaration” and denied Grin-dle’s motion to exclude Officer Brown’s recitation of his questioning of Grindle. And though he ruled Officer Browning’s testimony was admissible, the judge informed Grindle he was free to offer evidence challenging the credibility of Officer Browning’s testimony at trial. Thus, ultimately the jury would weigh the credibility of Officer Browning’s testimony.

III. Trial

A. Officers’ Testimony
¶ 15. In addition to the witnesses pointing to Grindle as the shooter, the State also called the officers who investigated Brown’s murder.
¶ 16. One of them, Officer Chris Brum-field, searched Grindle’s vehicle the day after the shooting. He was looking for both a gun as well as shell casings to compare with those found at the scene, but found neither. The State asked Officer Brumfield, without objection by Grindle, if Grindle had been found in possession of a .45 caliber pistol when he was arrested five months after the shooting. Officer Brum-field answered “yes,” but clarified that the Mississippi Crime Lab had ruled out the possibility that the gun seized in Grindle’s later arrest was the one used to shoot Brown.
¶ 17. The State also called Officer Browning, whose trial testimony about his hospital interview with Brown mirrored his testimony from the motion in limine hearing.
B. Nurse’s Testimony
¶ 18. Kayla Breland, the registered nurse who was in the emergency room while Brown was being treated, also testified in the State’s case. Breland confirmed that Officer Browning was in the emergency room that evening. But she could not recall if any conversation took place, as she was busy with Brown’s medical treatment. On cross-examination, Grindle’s counsel questioned Breland about her responsibility for monitoring Brown’s brain functioning though observing his verbal communication, eye response, and movement. Breland’s records showed she gave him a low Glasgow score when he arrived that decreased as the minutes passed. Breland testified that Brown’s score meant he could not verbally communicate or control his bodily movements. But on redirect, Breland testified Brown “possibly could have” nodded his head in response to Officer Browning’s questions. Grindle’s counsel neither renewed her objection to Brown’s dying dec *337 laration in light of Breland’s testimony nor asked for any instruction limiting Officer Browning’s testimony.
¶ 19. Grindle chose not to testify but called several defense witnesses.
C. Verdict
¶ 20. After deliberating, the jury found Grindle guilty of deliberate-design murder. He was sentenced to life imprisonment. Grindle filed a post-trial motion, which was denied, then timely appealed. Grindle then obtained new counsel who have thoroughly and vigorously pursued his appeal.[2]
Discussion
¶ 21. Grindle seeks a new trial, claiming that one preserved and numerous unpre-served errors require reversal of his conviction. He argues the evidence of both Brown’s dying declaration and Grindle’s second arrest were admitted in error, the jury was wrongly instructed, and the State made improper remarks during closing argument. He also claims his trial counsel’s deficient performance prejudiced his defense.
¶ 22. Because Grindle forfeited review of the majority of his appellate challenges by not urging them at trial, he proceeds solely under the more stringent plain-error doctrine on these unpreserved issues. Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). Under this standard, we will generally only exercise our discretion to review and correct a clear or obvious error if it “seriously affects the fairness, integrity or public reputation of judicial proceedings.” Id. Thus, our review on the waived issues focuses on whether there was a manifest injustice. Starr v. State, 997 So.2d 262, 266 (¶ 11) (Miss.Ct.App.2008) (citation omitted).

I. Admission of Brown’s Identification of the Shooter

¶ 23. Grindle insists the trial judge reversibly erred by admitting Brown’s “dying declaration” that Grindle shot him. We find this general issue is preserved. But his second more specific challenge that Breland’s later testimony rendered Brown’s already admitted dying declarations unreliable and, thus, retroactively inadmissible, was not raised at trial and is waived. Grindle also failed to preserve his suggestion that the admission of Brown’s “dying declarations” violated his constitutional right to confront the evidence against him. So our review of these more specific allegations is for plain error.
A. “Dying Declaration”
¶ 24. We find the hearsay about Brown’s identification of Grindle as the shooter met all the requirements of a dying declaration. Thus, it was within the trial judge’s discretion to deny Grindle’s motion in limine and admit Brown’s dying declaration. While we recognize portions of Breland’s subsequently given testimony about Brown’s consciousness level perhaps call into question the credibility or reliability of Officer Browning’s earlier-admitted testimony, Breland’s later testimony did not negate the fact that the trial judge had already properly admitted the dying declaration. Rather, to the extent discrepancies or inconsistencies exist between Officer Browning’s and Breland’s testimony, they were merely credibility and reliability *338 issues for the jury to resolve. So we are not swayed by his argument that the nurse’s testimony rendered the earlier testimony concerning Brown’s dying declaration inadmissible.

1. Admission Under Mississippi Rule of Evidence 801(b)(2)

¶ 25. We review evidentiary rulings for abuse of discretion, acknowledging that the trial judge “enjoys a great deal of discretion” regarding the admissibility of evidence. Gore v. State, 37 So.3d 1178, 1183 (¶ 13) (Miss.2010) (citation omitted). The trial judge admitted testimony about Brown’s nodding in response to Officer Browning’s questions based on Mississippi Rule of Evidence 804(b)(2). This eviden-tiary rule allows the admission of hearsay statements made “under belief of impending death” in homicide prosecutions.[3] M.R.E. 804(b)(2). To determine whether the statements were properly admitted requires a review of basic hearsay law.
¶ 26. Under Rule 801(a), Brown’s responsive nods to Officer Browning’s questions were “statements.” M.R.E. 801(a) (defining “statement” as including “nonverbal conduct of a person, if it is intended by the person as an assertion”). And these “statements” were indeed “hearsay” because they were offered to prove the truth of what Brown had asserted — that Grindle was the shooter. M.R.E. 801(c) (defining “hearsay” as an out-of-court statement offered to prove the truth of the matter asserted). Though Rule 802 instructs that “[hjearsay is not admissible except as provided by law[,]” Rule 804 provides several exceptions when the de-clarant is “unavailable.” M.R.E. 802, 804.
¶ 27. Since Brown died shortly after making the statements, he was no doubt “unavailable.” M.R.E. 804(a)(4). So Rule 804(b)(2) authorized the judge to admit “in [Grindle’s] prosecution for homicide ..., a statement made by [Brown] while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” M.R.E. 804(b)(2).

a. Rule 80Jp(b)(2)’s Purpose and Common Law

¶ 28. The purpose behind Rule 804(b)(2) was to codify the long-standing, “firmly rooted hearsay exception” for “dying declarations.” Ellis v. State, 558 So.2d 826, 829 (Miss.1990)); see also M.R.E. 804(b)(2) cmt. “[T]he dying declaration exception found its traditional justification in the once near universal view that no man would meet his maker with a lie on his lips.” Ellis, 558 So.2d at 829. Though “[w]e live in more secular times, ... [t]here remains a broad social consensus that dying declarations are generally reliable.” Id. Also, the more recently codified dying-declaration hearsay exception “is generally regarded as ‘less emphatic than in the common law cases[.]’” Id. 829-30 (quoting McCormick on Evidence, 829 (3d ed.1984)). And a leading legal treatise and the Mississippi Supreme Court have recognized that, after adoption of the rules of evidence, “ ‘perhaps a lesser showing would suffice’ than was required at common law” to secure admission of a dying declaration. Id.

b. Pre-Rules Cases

¶ 29. But Grindle harkens back to a number of pre-rules cases he claims impose common-law requirements grafted onto Rule 804(b)(2) — requirements he insists were not met when the judge ruled Brown’s dying declaration was admissible. After reviewing both pre — and post-evi- *339 dentiary rules decisions on this issue, we do agree that there appears to be some carry-over from the common-law exception for dying declarations to the evidence-rules exception for statements under belief of impending death. See Ellis, 558 So.2d at 829-80 (applying common-law rule that belief of impending death may be proved by circumstantial evidence). In particular, the Mississippi Supreme Court has found three general common-law requirements for a dying declaration — (1) that “[t]he wounded person is in extremis and dies after making the statement,” (2) that “[t]he person realizes that he is mortally wounded,” and (3) that “[h]e has no hope of recovery” — must still be met to admit a statement under belief of impending death under Rule 804(b)(2). Morris v. State, 777 So.2d 16, 23-24 (¶28) (Miss.2000). But Grindle does not contest that the three requirements were met.
¶30. Indeed, Grindle concedes Brown was “in extremis” and did die. And Brown’s realization of his mortal wound and the fact that he had no hope of recovery may be inferred from the nature and extent of his gunshot wounds. See Ellis, 558 So.2d at 830; Moore v. State, 81 So.3d 1147, 1153 (¶ 22) (Miss.Ct.App.2011). To rephrase in Rule 804(b)(2) terms, Grindle does not dispute that Brown’s “statements” were made “while believing that his death was imminent.” M.R.E. 804(b)(2). Since these statements “eon-cern[ed] the cause or circumstances of what he believed to be his impending death,” Brown’s nodding met all requirements of Rule 804(b)(2).
¶ 31. Yet Grindle still argues the trial judge abused his discretion in admitting Brown’s statements under Rule 804(b)(2). His chief complaint is not with the State meeting the three previously mentioned requirements. Rather, it is based on his recent appellate insistence that Brown was “medically unconscious” when Officer Browning interviewed him, thus rendering his purported statements inadmissible. As support, Grindle points to Breland’s later-given testimony and draws from pre-rules cases holding that “[t]o be admissible the declarations must come from one of sound mind.” Waits v. State, 492 So.2d 1281, 1288 (Miss.1986) (citing Walton v. State, 156 Miss. 499, 505, 126 So. 29, 31 (1930)). While we are hesitant to import an additional common-law requirement into Rule 804(b)(2), without instruction by the supreme court to do so, we note the issue of Brown’s consciousness level was indeed raised, explored, and at least implicitly ruled on at the pretrial motion in limine hearing.
¶ 32. Officer Browning was the only ■witness who testified at the hearing. And he was steadfast in his account that Brown was conscious and aware that Officer Browning was asking him questions. Officer Browning testified that the only reason Brown gave nonverbal responses was because he had a tube in his mouth. When Officer Browning asked Brown if knew who shot him, Brown “violently” responded “yes[.]” The officer explained that Brown “was trying to talk, but he had a trach. He was attempting — he even tried to pull it out at one point. They had to hold him down. He was shaking, yes, yes, yes, many times.”
¶ 33. When asked if Brown “was emphatic on knowing who shot him,” Officer Browning responded, ‘Yes, sir.” Officer Browning further explained that “between questions, [Brown] was completely — he was moving, but he wasn’t trying to answer anything. The only time he tried to respond to yes or no is when I asked him a question, at which time he again nodded yes, repeatedly.” From this, the judge held Brown’s statement was admissible as a dying declaration.
*340 ¶ 34. During cross-examination about Brown’s consciousness and the volition of his response, Officer Browning did not waiver. He consistently maintained Brown was indeed conscious, could hear and .understand his questions, and was using nonverbal movements to answer his questions. Thus, to the extent Rule 804(b)(2) may have codified the “sound mind” language from Watts, we find this requirement met.
¶ 35. Furthermore, Officer Browning’s trial testimony closely reflected his testimony from the pretrial hearing. Again, while according to the officer’s trial testimony, Brown was unable to speak, the officer believed Brown understood the questions and did not hesitate in responding. Officer Browning maintained that Brown “shook his head yes. He attempted to talk, but he was unable to.” And Brown nodded affirmatively “numerous times” when asked if Grindle was the shooter. As Officer Browning put it, Brown’s responses “were clear to me.”
¶ 36. We find these facts similar to those in Berry v. State, 611 So.2d 924, 925-27 (Miss.1992). In that case, a gunshot victim’s son testified that his father was unconscious when the son arrived to transport him to the hospital. Id. at 925. But according to the son, on them way to the hospital, the father regained consciousness just long enough to identify the shooter. Id. A doctor testified that upon arrival at the hospital the father was unconscious, with a blood-alcohol level of .30. The father never regained consciousness and died soon after. Id.
¶ 37. The question in Berry was whether the father had been “conscious of impending death” and, thus, met the requirements of Rule 804(b)(2). Berry, 611 So.2d at 927. Our supreme court found that based on the severity of the victim’s wounds and testimony from the victim’s son that his father regained consciousness just long enough to identify his shooter, it could be inferred that the father had been conscious of his impending death, making his identification of the shooter admissible under Rule 804(b)(2). Berry, 611 So.2d at 927. Similarly, here, based on Officer Browning’s testimony that Brown was conscious when asked if Grindle was the shooter, along with the severity of Brown’s gunshot wounds, it could be inferred Brown was conscious of his impending death, making his dying declaration admissible under Rule 804(b)(2).

2. Effect of Subsequent Evidence

¶ 38. We further find that Bre-land’s later-given testimony did not alter the admissibility of Brown’s dying declaration. Relying on admittedly “new testimony” presented after Officer Browning had already testified, Grindle suggests the judge should have known his previous ruling was erroneous and “immediately excluded [Officer] Browning’s testimony.” But there is an obvious timing problem with this argument.
¶ 39. As just discussed, the trial judge ruled that Brown’s dying declaration was admissible at the pretrial motion in limine hearing, during which Breland did not testify. Based on this ruling, Brown’s dying declaration was admitted during Officer Browning’s testimony, which was given before Breland took the stand. And after Breland testified, Grindle neither renewed his previous objection, made a new one, nor asked for an instruction limiting Officer Browning’s testimony. While Grindle did not need to renew his objection to preserve the review of the denial of his motion in limine, Goff v. State, 14 So.3d 625, 640 (¶ 46) (Miss.2009), Grindle did need to object to preserve the distinct, new error he claimed arose at trial, based on Breland’s testimony.
*341 ¶ 40. Grindle argues the trial judge erred by not changing course and reversing his previous evidentiary ruling and giving a limiting instruction. But Grindle cites no law that the judge had a duty to sua sponte “correct” a previous evidentiary ruling based on subsequent evidence not before the judge at the time of the ruling. And we decline to create or in any way impose such a duty in this case— especially when the later-given testimony merely challenged Officer Browning’s credibility and reliability, not the admissibility of Brown’s dying declaration.
¶ 41. Breland was the State’s witness, called to prove Officer Browning was in the emergency room questioning Brown before he died. On cross-examination, Grindle’s attorney explored the possibility that Brown had slipped into a coma and would have been unable to hear or have enough control over his movements to give a nonverbal response to Officer Browning’s questions. But Breland’s testimony was equivocal.
¶ 42. On redirect, she admitted it was also possible that Brown was conscious enough to respond. So contrary to Grin-dle’s characterization of Breland’s testimony, it did not necessarily prove Brown could not have made a dying declaration. Rather, it merely challenged the reliability of what Officer Browning testified happened in the emergency room.
¶ 43. To the extent Grindle now argues the trial judge erred by not giving a limiting instruction on the value of Officer Browning’s testimony in light of Breland’s testimony, we find this argument is waived as Grindle never requested such an instruction. Because Brown’s statements were introduced in conformity with a previous evidentiary ruling, we find no reversible error in the trial judge allowing his unchallenged evidentiary ruling to stand— a ruling we find was within his discretion.
B. Confrontation Clause
¶ 44. Grindle’s appellate counsel next asks for reversal based on another argument not raised at trial. He requests that we apply the plain-error doctrine and find Brown’s dying declaration violated his Sixth Amendment right to confrontation. Though this constitutional question was not preserved, the plain-error doctrine permits this court to consider an issue not properly raised if it affects a defendant’s “fundamental, substantive right.” Smith v. State, 986 So.2d 290, 294 (¶10) (Miss.2008) (citation omitted). Because a Confrontation Clause violation affects a fundamental, substantive right, the supreme court has reviewed unpreserved Confrontation Clause issues for plain error. E.g., Corbin v. State, 74 So.3d 333, 337 (¶¶ 10-11) (Miss.2011) (addressing Confrontation Clause argument, even though defendant failed to object at trial); Smith, 986 So.2d at 294 (¶ 10) (addressing Confrontation Clause violation even though not properly asserted as issue on appeal). However, after review, we find Grindle’s fundamental, substantive rights were not violated, because, since its inception, the right to confront one’s accuser has carved out an exception for dying declarations.
1. Confrontation and the Crawford Footnote
¶ 45. The Sixth Amendment of the United States Constitution, incorporated into the Fourteenth Amendment, guarantees the right of a criminal defendant to confront the witnesses against him. U.S. Const, amends. VI, XIV; see also Miss. Const, art. 3, § 26. Consequently, the United States Supreme Court has held that “testimonial” hearsay cannot be admitted against a criminal defendant unless the declarant is unavailable at trial and the defendant has had a prior opportunity to cross-examine the declarant. Crawford v. *342 Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
¶ 46. In many cases it is difficult to discern whether a witness’s statement is “testimonial” or “nontestimonial.” But here, there is little dispute that Brown’s identification of the shooter was “testimonial” hearsay. It was made in response to Officer Browning’s questioning. And Officer Browning admitted the purpose of the interview was to get Brown’s statement while he was still alive — not “to meet the ongoing emergency.” Michigan v. Bryant, — U.S. -, -, 131 S.Ct. 1143, 1165, 179 L.Ed.2d 93 (2011). So at first blush, it appears that because Grindle had no opportunity to cross-examine Brown before he died, Crawford supports that Grindle’s Sixth Amendment confrontation right was violated by admitting Brown’s testimonial hearsay. But a closer examination of Crawford and its progeny suggests this is not necessarily so.
¶ 47. In a footnote in Crawford, the Supreme Court acknowledged there is authority that dying declarations — even testimonial ones — are excepted from the Sixth Amendment’s confrontation requirement. The Crawford Court specifically recognized: “The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.” Crawford, 541 U.S. at 56 n. 6, 124 S.Ct. 1354 (emphasis added and internal citations omitted). But the Court sidestepped the question, reasoning, “We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is sui generis.” Id.
¶ 48. Four years later, the Supreme Court elaborated on the Crawford footnote: “We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying.” Giles v. California, 554 U.S. 353, 358, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (citing Crawford, 541 U.S. at 56 n. 6, 124 S.Ct. 1354).
¶ 49. And recently, in 2011, the Supreme Court again dealt with a dying declaration in context of the Confrontation Clause. Bryant, — U.S. -, 131 S.Ct. 1143, 179 L.Ed.2d 93. But as Justice Ginsburg noted in her dissent, the question whether the Sixth Amendment excepts dying declarations was not actually resolved, because it had been abandoned at the state level and was, therefore, not before the Supreme Court. Id. at 1177, 131 S.Ct. 1143 (Ginsburg, J., dissenting). Still, Justice Ginsburg added this “observation”:
In Crawford v. Washington ..., this Court noted that, in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the accused against admission of out-of-court testimonial statements was removed for dying declarations. This historic exception, we recalled in Giles v. California ..., applied to statements made by a person about to die and aware that death was imminent. Were the issue properly tendered here, I would take up the question whether the exception for dying declarations survives our recent Confrontation Clause decisions.
Id. While the Bryant majority analyzed the dying declaration’s admissibility under the “testimonial” versus “nontestimonial” approach, Justice Ginsburg suggests the *343 question whether dying declarations — even testimonial ones — violate the Confrontation Clause remains open for consideration.
¶ 50. Mississippi applied Bryant last year in Sanders v. State, 77 So.3d 484 (Miss.2012). But the hearsay exceptions at issue were “present-sense impression” and “excited utterance” — not dying declarations. Sanders v. State, 77 So.3d 497, 500 (¶ 9) (Miss.Ct.App.2011). So our state supreme court did not hold in Sanders that a hearsay statement admitted as a dying declaration is subject to testimonial-versus-nontestimonial analysis under Bryant.
¶ 51. Though neither the United States Supreme Court nor our state’s high court have spoken definitively on the matter, we are swayed by the United States Supreme Court’s commentary in Crawford and Giles that, were the matter properly before the Court, the exception would be held to apply. We are also persuaded, given the Mississippi Supreme Court’s adherence to the historical justifications and requirements for the admission of dying declarations, that were it to address the matter, it would find the historical exception for dying declarations is also an exception to the confrontation requirement in Mississippi’s constitution.

2. Other States’ Recognition of the Exception

¶ 52. Another convincing factor is that other states that have confronted the issue have reasoned that, because the dying-declaration exception existed when the Sixth Amendment was adopted, its application does not offend federal or similar state confrontation requirements.
¶ 53. The Supreme Court of California has held that, because the Confrontation Clause “ ‘is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding[,]’
... it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.” People v. Monterroso, 34 Cal.4th 743, 22 Cal.Rptr.3d 1, 101 P.3d 956, 972 (2004) (quoting Crawford, 541 U.S. at 54, 124 S.Ct. 1354). And the Supreme Court of Wisconsin, in an opinion handed down after Bryant, found:
Given [Giles’s] recent acknowledgement of the dying declaration hearsay exception under the common law at the time of the founding and specifically the ratification of the Sixth Amendment, as well as the assertion of treatise writers such as Wigmore that the exception was not merely in existence but was centuries old by that point, the logic of Giles cannot support the conclusion that the hearsay exception afforded for dying declarations offends the constitution.
State v. Beauchamp, 333 Wis.2d 1, 796 N.W.2d 780, 792-93 (2011). See also Commonwealth v. Nesbitt, 452 Mass. 236, 892 N.E.2d 299, 311 (2008) (“Considering the Supreme Court’s guidance on the issue, we are reluctant to expand that right beyond the historical parameters indicated in Crawford.” (quoting People v. Gilmore, 356 Ill.App.3d 1023, 293 Ill.Dec. 323, 828 N.E.2d 293, 302 (2005))); People v. Clay, 88 A.D.3d 14, 26-27, 926 N.Y.S.2d 598 (N.Y.App.Div.2011) (“[W]e read Crawford to signify that the substance of the right of confrontation enshrined in the Constitution is informed by the contemporaneous understanding of that right at common law, and is not, instead, an abrogation of it.”); State v. Lewis, 235 S.W.3d 136, 148 (Tenn.2007) (“Because the admissibility of the dying declaration is also deeply entrenched in the legal history of this state, it is also our view that this single hearsay exception survives the mandate of Crawford regardless of its testimonial nature.”); Gardner v. State, 306 S.W.3d 274, 289 (Tex.Crim. *344 App.2009) (“This exception to the hearsay-rule has been accepted under common-law tradition since before the drafting of the American Constitution.”); Satterwhite v. Commonwealth, 56 Va.App. 557, 695 S.E.2d 555, 559 (2010) (“[T]he admission of dying declarations as evidence[ ] is not repugnant to the bill of rights.” (quoting Hill v. Commonwealth, 43 Va. (2 Gratt.) 594, 608 (1845))).
¶ 54. In light of the fact that we are unaware of any federal or state court that has held the admission of a dying declaration offends a defendant’s constitutional right to confront his or her accuser, we too find the admission of Brown’s dying declaration did not violate Grindle’s Sixth Amendment right to confrontation.

II. Admission of Grindle’s Gun-Related Crime

¶ 55. Grindle next argues the trial judge reversibly erred by admitting Officer Brumfield’s testimony about Grindle’s separate arrest for possession of a stolen firearm. Grindle claims this evidence violated Mississippi Rules of Evidence 404(b) and 403.[4] Under Rule 404(b), “[ejvidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith,” though it may be admissible for other purposes. If a trial judge overrules a Rule 404(b) objection, finding the evidence of another crime or wrong admissible for one of these other purposes, the trial judge must also conduct a Rule 403 balancing test. This filtering analysis requires assessing whether the probative value of the evidence outweighs the danger of undue prejudice before evidence may be admitted. Watts v. State, 635 So.2d 1364, 1368 (Miss.1994).
¶ 56. Once again, Grindle did not object or in any way argue that the evidence of his subsequent arrest was being elicited in violation of Rule 404(b). So his Rule 404(b) argument is waived. See Ruben-stein v. State, 941 So.2d 735, 760 (¶ 87) (Miss.2006) (holding that failure to object to statements of prior bad acts barred argument on appeal that statements violated Rules 404(b) and 403, without conducting any plain-error analysis). And by not objecting under Rule 404(b), his right to a weighing of the evidence under Rule 403 and an instruction on the limited purpose of separate-crimes evidence was not invoked. See Rodgers v. State, 111 So.2d 673, 675-76 (¶ 8) (Miss.Ct.App.2000). Thus any resulting error was forfeited.
¶ 57. But Grindle’s waiver aside, we find no merit to his general Rule 404(b) argument. Nor do we agree with his more particular two-fold argument that it was the testimony about the specific crime— possession of a stolen firearm — and the fact it was also firearm related that made *345 Officer Brumfield’s testimony more prejudicial than probative. As to this, we are mindful that Officer Brumfield only testified on direct that Grindle had been arrested and, when he was arrested, a .45-caliber pistol was recovered but did not match the murder weapon. And Grindle did not object to this testimony. It was Grindle’s attorney, not the State, that brought up the underlying reason for his arrest — that he allegedly possessed a stolen pistol. Because Grindle’s lawyer was the one who elicited the testimony, Grindle cannot argue now it was improperly introduced. See Rubenstein, 941 So.2d at 755 (¶¶ 52-53) (holding appellate argument that statement violated Rule 404(b) was improper because it was the defendant who elicited the statement at trial).
¶58. Despite Grindle’s opening the door to this evidence, his appellate counsel argues the trial judge, by not sua sponte striking the testimony about the allegedly stolen second pistol, failed in his duty to protect the “fundamental fairness” of Grindle’s trial. As support, he relies on Flowers v. State, 778 So.2d 809, 324 (V 48) (Miss.2000), a case where the defendant had filed a motion in limine to exclude evidence that he killed three other people before committing the murder for which he was being tried. In Flowers, the Mississippi Supreme Court found that the trial judge erred by admitting the evidence without conducting the required 403 balancing test triggered by the Rule 404(b) objection. Flowers, 773 So.2d at 324 (¶¶ 48-50). This error led to numerous references by multiple witnesses to the fact that the defendant had killed other people. Id. at 323 (¶¶ 44-45). And it was “the cumulative effect of the prosecutor’s pattern of repeatedly citing to the killing of the other three victims throughout the guilt phase proceedings [that led the court] to hold that [the defendant] was absolutely denied a fundamental right to a fair trial.” Id. at 325 (IT 52).
¶ 59. We find Officer Brumfield’s testimony hardly rises to the level of unfairness in Flowers. There was no pattern of testimony emphasizing other murders by Grindle. Instead, only one witness linked Grindle with the .45 caliber pistol found six months after the murder had been committed. And the witness acknowledged this particular pistol was not the one used to shoot Brown. Perhaps the reason Grin-dle’s trial attorney brought up the nature of the later gun-based arrest was to establish that the gun Grindle was later charged with possessing was not the weapon that killed Brown, a fact she may have reasonably deemed more helpful than hurtful to his defense. But we need not get hung on her intentions or defense strategy, since regardless of her motives, we find the admission of evidence of Grindle’s separate arrest — elicited by both the State and Grindle without objection — did not result in a fundamentally unfair trial. Thus, we find no plain error in its admission. See Starr, 997 So.2d at 266 (¶ 11).

III. Jury Instructions

¶ 60. Grindle next challenge the deliberate-design-murder instruction and presumption-of-malice instruction. Before addressing his arguments, we note there was no court reporter at the jury-instruction conference, so if Grindle’s counsel had made any objections to these instructions, they are not part of the record. But there is record evidence that the State and Grin-dle agreed that the jury not be instructed on the lesser-included crime of manslaughter. Thus, essentially, each side took an all-or-nothing approach — either Grindle committed deliberate-design murder or no crime at all.
¶ 61. Because the duty to create a record lies with Grindle, we find he *346 waived challenges to the substantive murder instruction and presumption-of-malice instruction. Neal v. State, 15 So.3d 388, 397 (¶ 13) (Miss.2009) (“This Court has held on numerous occasions that an offended party’s failure to object to jury instructions at trial procedurally bars the issue on appeal.” (quoting Smith v. State, 835 So.2d 927, 939 (¶ 34) (Miss.2002))). So once more we resort to plain-error analysis.
A. Deliberate-Design-Murder Instruction
¶ 62. Jury Instruction 5, the deliberate-design-murder instruction, informed the jury that to find Grindle guilty of murder, it had to find beyond a reasonable doubt that:
1) Charles Brown was a living person; and
2) On or about November 6, 2010, in Marion County, Mississippi, the defendant, Brandon Grindle a/[k]/a “Bam” did kill Charles Brown with a firearm;
3) With deliberate design and malice aforethought;
4) Without authority of law; and
5) Not in necessary self-defense.
See Miss.Code Ann. § 97-3-19(l)(a) (listing elements of deliberate-design, or “first-degree,” murder).
¶ 63. After reviewing this instruction, we find it contained all required elements of the crime. Therefore, we need not contemplate whether Grindle’s substantive rights were affected by giving this instruction.
B. Presumption-of-Malice Instruction
¶ 64. Grindle’s chief instruction-based complaint is that Jury Instruction 6 negated Jury Instruction 5’s requirement that the jury find Grindle killed Brown with malice.[5] Jury Instruction 6 was an “inference-of-malice” or “presumption-of-malice” instruction. See Carter v. State, 493 So.2d 327, 330 (Miss.1986). It informed the jury “that if wounds are inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm then intent or purpose to kill may be inferred from the use of the weapon.” Under Mississippi law, malice is “a necessary element of murder but not of manslaughter[J” Anderson v. State, 79 So.3d 501, 507 (¶ 24) (Miss.2012) (emphasis added). And malice “may be inferred from the use of a deadly weapon.” Id.
¶ 65. But “[w]hen all the evidence in a case has been adduced, the presumption, if any at the outset, disappears[,]” and the jury should “draw inferences from the evidence without the State bolstering its evidence” through a presumption instruction. Carter, 493 So.2d at 330. Thus, our supreme court has held that a request for a presumption-of-malice instruction “should be granted only where the evidence has failed to establish the circumstances surrounding use of the weapon. Where the facts have been set forth, even on conflicting testimony, the question of malice should be left for the consideration of the jury.” Id.
¶ 66. Grindle maintains the presumption-of-malice instruction was erroneously *347 given because there was “direct,” versus merely “circumstantial,” evidence that Grindle used a deadly weapon to kill Brown. However, evidence establishing the “circumstances surrounding the use of the weapon” is not a reference to “non-circumstantial” evidence. Instead, “circumstances surrounding the use of the weapon” refers to “facts in evidence explain[ing] the character of the killing.” Dickins v. State, 208 Miss. 69, 93, 43 So.2d 366, 373 (1949).
¶ 67. We agree there was evidence that the “character” of the shooting was deliberate and malicious. On the day of the shooting, Grindle had supposedly been complaining about Brown and had been driving around with a gun. There was also testimony that when he drove past the unarmed Brown, he shot him twice. But while this evidence made the presumption-of-malice instruction unnecessary, it does not necessarily mandate reversal. Like the supreme court in Carter, we too find any error in the giving of the presumption instruction was harmless— particularly when considered in combination with the other instructions and in light of the fact that Grindle made no objection. See Carter, 493 So.2d at 330.
¶ 68. This is not a case like Tran v. State, 681 So.2d 514, 517-18 (Miss.1996). In that case, there was conflicting evidence surrounding the character of the killing. The jury heard several versions of the fatal shooting — including the defendant’s account that he only grabbed his gun after the victim pointed a gun at him and said “one of you are going to die.” Id. at 515. Thus, the instruction that the jury presume the defendant shot the victim with malice infringed on the jury’s role to sift through the contradictory evidence and resolve beyond a reasonable doubt whether the shooting was malicious or in self-defense. Id. at 518.
¶ 69. But here, there was no contradictory evidence about the character of the shooting. See Dickins, 208 Miss, at 93, 43 So.2d at 373. Grindle’s defense theory was misidentifieation — that he was not the shooter. He did not assert self-defense or present any evidence that competed with the State’s theory that the shooting was deliberate. So there was simply no conflicting evidence to support that the shooting was justified, necessary, coerced, or accidental. Because an inference of malice is supported by undisputed evidence of the malicious nature of the shooting, under these circumstances, the judge’s giving of an instruction based on this inference was, at most, harmless error.

IV. State’s Closing Argument

¶ 70. Grindle’s next appellate challenge involves another unpreserved issue, this time involving the State’s closing argument. While Grindle’s trial attorney did not find the State’s closing argument objectionable, Grindle now insists the judge erred in not sua sponte striking what he deems an impermissible “send-a-message” argument. On review, we find the State’s comments were not “so inflammatory” that the trial judge should have objected on the judge’s own motion. See O’Connor v. State, 120 So.3d 390, at 399 (¶ 23) (Miss.2013) (on rehearing).
¶ 71. State prosecutors may not “encourage juries to use their verdict to ‘send-a-message’ to the public or to other potential criminals.” Brown v. State, 986 So.2d 270, 275 (¶ 11) (Miss.2008). This is because “[t]he issue which each juror must resolve is not whether or not he or she wishes to ‘send a message’ but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged.” Id. (quoting Williams v. State, 522 So.2d 201, 209 (Miss.1988)). Impermissible comments *348 are those “which tend to cajole or coerce a jury to reach a verdict for the purpose of meeting public favor and not based on the evidence.” Spicer v. State, 921 So.2d 292, 318 (¶ 55) (Miss.2006) (modified by Brown, 986 So.2d at 286 (¶ 16), and partially abrogated by O’Connor, 120 So.3d at 400-01 (¶¶ 28-29)) (citation omitted).
¶ 72. When reviewing a send-the-message complaint, we begin with two threshold questions, followed by a two-prong test. O’Connor, 120 So.3d at 399 (¶ 23); Brown, 986 So.2d at 275-76 (¶ 13). The threshold questions are: (1) did defense counsel object, and (2) was the comment uninvited by the defense. Id. at 276 (¶¶ 13-14). But here, “[w]e need not proceed beyond the first threshold question[,]” since Grindle’s lawyer did not object to the comments. O’Connor, 120 So.3d at 399 (¶ 26). Still, even where there is no objection at trial, “we will review on appeal a claim that a prosecutor made an improper send-a-message argument ‘if the argument is so “inflammatory” that the trial judge should have objected on his own motion.’ ” Id. (quoting Spicer, 921 So.2d at 317 (¶ 52)). So we look to the particular comments.
¶ 73. During the State’s closing argument, the prosecutor told the jury:
My learned colleague said she is proud that we live in a country where a person is presumed innocent. I am too. I wouldn’t have it any other way. But I am also proud of the fact that what’s reasonable doubt in Florida may not be reasonable doubt here in good old Marion County, Mississippi. I’m proud of that more than anything. I’m proud that here in Marion County we can make our own, whether it’s reasonable doubt or not. And we can see the forest for the trees, is what I’m proud of. And when we’ve got an eyewitness that don’t have no reason or no motive to lie, who says — points the finger at this man right here and tells you that was him and I’ve known him and I know his vehicle and that was him and that’s not impeached, then that’s enough.... And I’m going to sit down. I’m going to let y’all go take y’all’s twelve good ears — y’all’s 24 good ears and twelve good minds and y’all look at all this and put it all back together, and you can come out and say, I don’t know what reasonable doubt is in California and Florida, but this ain’t reasonable doubt in Marion County.
(Emphasis added). Grindle argues the statements mentioning Florida and California were references to the Casey Anthony and O.J. Simpson trials.[6] He claims the improper message the jury was invited to send was that, while Florida and California juries may misunderstand or have incorrect notions of what reasonable doubt is, Marion County, Mississippi juries should show they do not.
¶ 74. However, because Grindle’s attorney did not make a contemporaneous objection to the “Florida” and “California” references, this issue is procedurally barred. See id. For this court to reach the question of reversible error, we must find the argument was “so ‘inflammatory’ that the trial judge should have objected on his own motion.” Id.; see also Brown, 986 So.2d at 276 (¶ 13). While we find the prosecutor’s comments were perhaps ill-advised, they do not rise to the high level necessary for a trial judge to take it upon himself to interrupt and curtail a party’s argument.
*349 ¶ 75. Any references to Casey Anthony or O.J. Simpson, if indeed that was the prosecutor’s intent, were minimal in the overall context of the State’s closing. And several courts that have considered references to O.J. Simpson’s trial have deemed the comments harmless.[7] Furthermore, the judge properly instructed the jury that attorney arguments are not evidence — an instruction we must presume the jury followed. Johnson v. State, 475 So.2d 1186, 1142 (Miss.1985).
¶ 76. But even if we were to go past the threshold inquiries and apply the two-prong test, there is no reversible error because Grindle cannot show prejudice. Under this two-prong test, for the remarks to rise to the level of reversible error: (1) the remarks must have been improper, and (2) the improper remarks must have prejudicially affected the defendant’s rights. Brown, 986 So.2d at 286 (¶ 15). Prejudice is lacking when it is “clear beyond a reasonable doubt that, absent the prosecutor’s inappropriate comments, the jury would have found the defendant guilty.” Id. (citation omitted). And based on the overwhelming evidence of Grindle’s guilt, we are confident that without these now-complained-of comments, the jury would have still found Grindle guilty.

V. Ineffective Assistance of Counsel

¶ 77. Grindle’s final argument shifts focus from the trial judge to his trial counsel. He cites a variety of alleged deficiencies, mostly consisting of her silence on issues Grindle’s appellate lawyers now deem objectionable. Grindle argues, because of these inactions or omissions, she provided him constitutionally ineffective assistance. See U.S. Const, amends. VI, XIV. While we acknowledge the seriousness of his allegations, this court and our supreme court are generally hesitant to address the merits of an ineffective-assistance claim on direct appeal. We typically do so only when: “(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.’ ” Jackson v. State, 73 So.3d 1176, 1181 (¶ 20) (Miss.Ct.App.2011) (quoting Colenburg v. State, 735 So.2d 1099,1101 (¶ 5) (Miss.Ct.App.1999)).
¶ 78. Here, the State does not stipulate the record is adequate for review. And even Grindle admits he raises several arguments not readily apparent from the record “out of caution.” So for us to address the merits of Grindle’s ineffective-assistance claim, we would have to find the record affirmatively shows “ineffectiveness of constitutional dimensions,” which we do not.
¶ 79. When considering ineffective assistance on direct appeal, “[t]he question presented is not whether trial counsel was or was not ineffective but whether the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial[] sua sponte on the basis of trial counsel’s performance.” Id. (quoting Colenburg, 735 So.2d at 1102 (¶ 8)). Grin-dle argues his counsel’s deficient performance was affirmatively shown by her failure to preserve as error the issues he has *350 raised in his appeal. However, from our review, it appears many of his trial attorney’s decisions were calculated. So we cannot confidently say the trial judge had a duty to sua sponte declare a mistrial.
¶ 80. We have held that a defense attorney’s “choice[s] of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy and will not stand as support for an ineffective assistance of counsel claim.” Id. at 1181-82 (¶ 22) (quoting Hancock v. State, 964 So.2d 1167, 1175 (¶ 18) (Miss.Ct.App.2007)). This deference to legal strategy is somewhat akin to the instruction appellate courts have been given to “strongly presume that counsel’s conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.” Liddell v. State, 7 So.3d 217, 219-20 (¶ 6) (Miss.2009) (quoting Bennett v. State, 990 So.2d 155, 158 (¶ 9) (Miss.2008)). Here, we find nothing to overcome this presumption, but admittedly, the record is not as developed as it would be in a post-conviction-relief proceeding.
¶ 81. Instead, we find Grindle’s claim more appropriate for a motion for post-conviction relief, where the record regarding counsel’s performance may be fully developed. We thus deny Grindle’s claim without prejudice, preserving his right to raise the issue of his trial counsel’s performance in a post-conviction-relief proceeding.
¶ 82. Because we find none of the alleged errors, nor any combination of them, require reversal, we affirm.
¶ 83. THE JUDGMENT OF THE MARION COUNTY CIRCUIT COURT OF CONVICTION OF DELIBERATE-DESIGN MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A FINE OF $2,500 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MARION COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.

. The Glasgow Coma Scale is a neurological scale used by medical professionals to gauge a patient’s level of consciousness.

. At trial, Grindle was represented by Eleanor Faye Peterson. Following the denial of Grin-dle's post-trial motion, Peterson sought on behalf of Grindle in forma pauperis status and court-appointed appellate counsel, which the trial court granted. While the trial court initially appointed George Holmes of the Office of Indigent Appeals to represent Grindle on appeal, this court granted Holmes’s motion to withdraw and substitute Merrida Coxwell and Charles Richard Mullens as Grindle's appellate counsel.

. The exception does not apply to non-homicide criminal cases. But it does apply to all civil cases. M.R.E. 804(b)(2).

. Grindle also challenges the admission of evidence that his parents had been arrested for not turning Grindle in to the authorities. Grindle had sought to exclude this evidence as irrelevant. The trial judge permitted the admission of this evidence, so long as it was made clear to the jury that Grindle had voluntarily turned himself in. On appeal, Grindle argues this evidence violated Mississippi Rules of Evidence 608 and 609. But those rules specifically apply to character evidence and impeachment of a “witness.” M.R.E. 608, 609. Grindle’s parents did not testify, so there can be no violation of Rules 608 and 609. Grindle also argues this evidence violated Rule 404(b). But evidence of the crime, wrong, or act — Grindle's parents’ arrest — was not admitted to prove Grindle’s parents "acted in conformity therewith.” Thus, there can also be no Rule 404(b) violation. See M.R.E. 404(b). And to the extent this evidence related to acts by Grindle, the trial judge restricted his ruling to evidence that Grindle turned himself in as soon as he learned authorities were looking for him. So there was no evidence of a "wrong” by Grindle admitted in violation of Rule 404(b).

. In his initial brief, Grindle had also argued the trial judge’s giving of Jury Instruction 10, an instruction he requested, was plain error. But in its brief, the State pointed out the "familiar rule of law that one may not complain of his own instruction.” Caston v. State, 823 So.2d 473, 508 (¶ 121) (Miss.2002) (quoting Hall v. State, 420 So.2d 1381, 1386 (Miss.1982)). And in his reply brief, Grindle conceded this point and abandoned his challenge to Jury Instruction 10, instead arguing the request for this instruction goes to the issue of his counsel's performance.

. In 2011, the State of Florida tried Casey Anthony for the murder of her two-year-old daughter, among other crimes. In 1994, the State of California tried Heisman Trophy winner O.J. Simpson for the murder of his wife and her friend. Both trials received national media attention, and both trials resulted in acquittals on the murder charges.

. E.g., Perdomo v. State, 829 So.2d 280, 281 n. 1 (Fla.Dist.Ct.App.2002); People v. Evans, 209 I11.2d 194, 283 Ill.Dec. 651, 808 N.E.2d 939, 955-56 (2004); State v. Snyder, 750 So.2d 832, 845-46 (La. 1999); State v. Taylor, 650 N.W.2d 190, 207-08 (Minn.2002); State v. Thompson, 578 N.W.2d 734, 743 (Minn.1998); State v. Jones, 320 S.C. 555, 466 S.E.2d 733, 734 (S.C.Ct.App.1996)(all holding improper remarks in closing about O.J. Simpson were harmless errors not affecting the jury’s verdicts).